Corn Products Refining Company v. Commissioner.
Corn Prods. Ref. Co. v. Commissioner
Docket No. 22074.
United States Tax Court
1952 Tax Ct. Memo LEXIS 154; 11 T.C.M. (CCH) 721; T.C.M. (RIA) 52214; June 30, 1952
Jay O. Kramer, Esq., and Samuel A. McCain, Esq., for the petitioner. Walt Mandry, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies for the year 1942 in excess profits tax and declared value excess profits tax of $1,520,519.39 and $14,487.94, respectively. Petitioner does not contest certain adjustments. The issues remaining are: 1(a). Whether the profits and losses sustained *155 by petitioner in the years 1939 to 1942, inclusive, on the purchase and sale of corn futures constituted capital gains and losses under section 117, and thus a proper elimination from base period losses for excess profits tax purposes. 1(b). Whether losses sustained by petitioner from transactions in corn futures are subject to the wash sales provisions of section 118. 1(c). If the answer to 1(a) is in the negative, whether the net loss on corn futures transactions sustained by petitioner in the base period year 1939 constituted an abnormal deduction under section 711(b)(1)(J)(ii). 2. Whether dividends declared by foreign corporations payable to petitioner in foreign currency in the base period year 1939 were so blocked by foreign exchange restrictions as not to constitute taxable income in that year. 3. Whether sums paid out as "salaries" and included as part of cost of sales are deductible, although in a later year it was discovered that the amounts had been embezzled and reimbursement from insurance was subsequently received. 4. Whether, in computing petitioner's unused excess profits credit carry-over from 1941 to 1942, the provisions of section 721 apply so as to exclude *156 1941 abnormal income from excess profits net income of that year, even though petitioner had no excess profits tax liability for 1941. Some of the facts have been stipulated. The record in Corn Products Refining Co., 16 T.C. 395, has been incorporated by agreement as evidence in this proceeding. Findings of Fact The stipulated facts in this proceeding, and the findings of fact in Corn Products Refining Co., 16 T.C. 395, are hereby found accordingly. Petitioner is a New Jersey corporation with its principal office in New York City. It filed its 1942 return with the collector of internal revenue for the second district of New York. Issue 1 Petitioner is engaged in the manufacture and sale of corn products, including starches, sugar, syrups, oils and feeds. The principal product obtained by petitioner from raw corn is starch. Cerelose, which is one of petitioner's major products, is a refined sugar derived from starch which competes with cane and beet sugar. Petitioner's plants have a daily grind capacity of 170,000 bushels, and its raw corn storage capacity of 2,303,000 bushels enables it to keep on hand somewhat less than a three-weeks' supply. *157 In the years 1938 to 1942, inclusive, petitioner made purchases of raw corn aggregating 35,650,773, 36,806,869, 37,222,409, 54,079,173, and 60,761,513 bushels, respectively. Petitioner's sales policy has been to contract for shipments within 30 days at a specified tentative price, with the understanding that the final price shall be the contract price or market price at date of delivery, whichever is lower. When a customer refuses to accept delivery of cerelose or feed, it has been petitioner's practice to cancel the unexecuted portion of the order. Petitioner's general sales policy of contracting for 30-day shipments has had exceptions and variations, including the following: In 1927, petitioner entered into a contract with the Huron Milling Company, and in 1932 it entered into a contract with the Keever Starch Company, under both of which contracts petitioner was required to manufacture and deliver large quantities of starch for a period of 15 years, the price in both contracts being dependent upon a number of factors, including the price of corn and labor. The Huron contract was modified on June 1, 1942, and extended for an additional 10 years. In May 1939 petitioner entered *158 into a contract with Eastern Milling Co. under which petitioner was required to deliver quantities of feed each month until May 1940, with a guarantee as to price. On January 15, 1940, petitioner invited all buyers to submit on or prior to January 20, orders for cerelose to be delivered as late as June 30, 1940, buyers being guaranteed the lower of the January 15 price or the price in effect at date of delivery, and being allowed to cancel all or part of their orders. Petitioner received many orders in response to that invitation and its sales of cerelose at that time approximated 2,000,000 bags. Members of the canning industry on the Pacific Coast have been permitted to call on petitioner for cerelose for delivery in more than 30 days, with price guarantees and allowance for cancellations. For a number of years it has been petitioner's custom to purchase and sell corn futures contracts through members of a recognized Commodity Exchange. A corn future is a contract calling for the delivery at a stated time, within eleven months or less, of 5,000 bushels of corn or some multiple thereof, of a stated quality, at a stated price. Petitioner engaged in futures transactions as a part of *159 its corn buying program and as the most economical method of obtaining an adequate supply of raw corn in view of its limited storage facilities and the expense of increasing those facilities sufficiently to take care of its needs. Purchases of futures were made when the price of corn was advantageously low. Petitioner took delivery of corn on some contracts, but it usually sold most of its futures in early summer if it then appeared that there would be no shortage of corn and no great danger of increased prices. If the crop was poor or there was danger of a price increase it sold its futures gradually as it bought corn for grinding. Petitioner would begin to acquire additional futures contracts at harvest time each year. The corn futures contracts were not subject to depreciation and were not included in inventory. Petitioner's raw corn inventory account was affected only when petitioner took delivery under a futures contract. Profits or losses on futures were shown in a "Corn Miscellaneous" account. The net gain or loss for each year was debited or credited to cost of sales, and treated as a reduction or addition to cost of goods sold. During late 1939 and early 1940 petitioner *160 maintained a long position in corn futures contracts of from 7,000,000 to 8,000,000 bushels. In 1940 the Commodity Exchange Authority formally charged petitioner with speculating in grain on the ground that it had a long position in excess by more than 2,000,000 bushels of the amount it required for hedging. At a hearing petitioner took the position that its futures were not in excess of its needs and that the contracts it held were necessary to cover the products which it expected to market over a period of 15 to 18 months. In demonstrating its needs petitioners submitted evidence as to its unfilled orders, its sales commitments, its contracts with the Huron Milling Company and the Keever Starch Company, and the estimated number of bushels of corn that would be required to meet such commitments. Petitioner relied also upon weekly and daily reports which it had filed with the Authority giving information as to its position with respect to grain futures. Petitioner had included in those reports, among other matters, detailed information as to its transactions in grain, and its purchase and sales commitments for grain, or grain products, and it stated in such reports that its futures *161 were classifiable in character as hedging, rather than as speculative transactions. Petitioner was upheld in its contentions in the proceeding before the Commodity Exchange Authority, and the action was dismissed. The parties have stipulated the net gain or loss from the purchase and sale of corn futures in each year from 1932 to 1942, inclusive, the monthly purchases of bushels of raw corn by petitioner from January 1938, to December 1942, the monthly purchases and sales of corn futures during the same period including the number of contracts and number of bushels, the monthly purchases of corn futures from October 1937 to December 1942 under which delivery was taken at maturity dates, the monthly sales of corn futures from January 1938 through December 1942, including the number of contracts and number of bushels, and the stock on hand and unfilled orders for cerelose and for feed at the beginning of each month during the year 1942. The parties have stipulated for each of the years 1939 and 1942 the separate gain or loss to petitioner resulting from the sale of corn futures held for not more than six months and from the sale of corn futures held for more than six months, as computed *162 both with and without the application of section 118 of the Internal Revenue Code. During 1942 petitioner had gross sales of more than $131,000,000 and gross profits from sales of more than $35,000,000. Its net loss from the purchase and sale of corn futures was $109,969.38. At the beginning and end of that year its inventory (including raw corn and processed products valued at cost or market, whichever was lower) was approximately $7,650,000 and $5,900,000, respectively. There was no significant change in petitioner's method of doing business between December 31, 1940, and December 31, 1942. Petitioner's purchases of corn futures did not constitute speculative transactions for profit, but were consummated in order to obtain business protection and to insure the profitable conduct of its business. Issue 2 During all periods material to this proceeding the books and records of petitioner and its subsidiaries were kept on an accrual basis. During 1939 Maizena, Brazil, S.A., a Brazilian corporation, hereinafter called Maizena, and Refinacoes De Milho, Brazil, S.A., a New Jersey corporation, hereinafter called Refinacoes, were petitioner's wholly--owned *163 subsidiaries. In that year Refinacoes owed Maizena money for commissions. On the books of Maizena the commissions were credited to profit and loss, and debited to its accounts receivable account for Refinacoes. Maizena paid taxes to Brazil upon the commissions. In December 1938 Maizena declared a dividend, payable January 13, 1939, and set up on its books an account payable to petitioner in the amount of 2,175,000 Brazilian milreis. In June 1939 petitioner debited an accounts receivable account known as blocked account, Maizena, Brazil, S.A., and it credited blocked income which was a deferred credit income account. Petitioner used a rate of exchange of 5.95 cents per milrei. The Internal Revenue Bulletin stated that the rates of exchange acceptable as the prevailing current or market rates were 5.86 cents per milrei as of December 30, 1938, and 6.058 cents per milrei as of December 30, 1939. There was also an unofficial rate of exchange in Brazil. Petitioner was interested at that time in selling milreis for dollars to foreign exchange dealers in New York, if favorable rates were obtainable. There were restrictions in Brazil in 1939 with respect to transmitting funds out of that *164 country. The record does not disclose the nature or extent of such restrictions. In 1939 petitioner received a portion of the above dividend in the amount of $4,862.31, which was the dollar equivalent of 100,649.9 milreis. That payment was made by draft, payable in petitioner's favor, and drawn by the Bank of Brazil upon the Guaranty Trust Co. The record does not disclose the circumstances under which such drafts were procured. Petitioner received the balance of the dividend in 1940. Upon receiving payment petitioner debited its cash and blocked income accounts, and credited income and its blocked account, Maizena, Brazil, S.A. During 1939 petitioner was a major stockholder in several Italian companies, including S.A. Antichromos Dott Aldo Volpino-Milan, hereinafter called Anticromos, S.A. Ligure Industriale Commerciale-Genoa, hereinafter called Ligure, S.A. Prodotti del Mais-Milan, hereinafter called Prodotti, and Fabbriche Riunite Amido Glucosia Destrina-Milan, hereinafter called Fabbriche. Petitioner had wholly-owned Italian subsidiaries, in-including Societe Finanziaria Agricola Italo-Americana-Milan, hereinafter called Finanziaria. In May 1939 dividends in lire were declared *165 by the above corporations and set up on their books as account payable to petitioner, as follows: Anticromos - 142,920; Ligure - 565,763; Prodotti - 1,643,718; and Fabbriche - 2,143,926 lire. In that year petitioner entered the above amounts on its books by debiting its accounts receivable maintained for the above corporations which were called blocked accounts, and by crediting its blocked income account, which was a deferred credit to income. Petitioner used a rate of 5.2625 cents per lire which was the published rate of exchange on the date of declaration of dividends. The dividends declared by Anticromos and Ligure were paid in the same year to petitioner's subsidiary, Finanziaria. Finanziaria credited petitioner's account and accrued interest which was also credited. An undisclosed portion of the dividends received by Finanziaria and an undisclosed portion of the dividends declared by Prodotti and Fabbriche were transferred on undisclosed dates to Italian banks for petitioner's credit. The record does not disclose when the Italian dividends which were declared in 1939 payable to petitioner were received by the latter. Petitioner was anxious at a reasonable price to realize *166 dollars for its lire, and it was able in New York to sell to foreign exchange dealers some of the lire in its bank accounts at unofficial rates. In November and December 1939 petitioner converted the sums of 210,000 and 200,000 lire into dollars at an average rate of approximately $.021 per lira. The latter lire would come out of dividends declared in 1936, if treated on a first in, first out basis. The record does not disclose the nature or extent of the exchange restrictions in Italy on transmitting funds out of that country. Petitioner's consistent bookkeeping practice, in treating a foreign dividend payable to it and blocked by exchange restrictions, has been to record the dividend as a receivable at the prevailing rate of exchange with a credit to deferred income, and to treat the amount as income in the year of actual receipt in the United States. Petitioner has adhered to that procedure following an internal revenue agent's suggestions in connection with examinations of its returns for certain years prior to the period here involved. Petitioner's 1939 tax return reported as income the portion of the Maizena dividend received in that year. It did not report the remainder *167 of the Maizena dividend of the dividends declared in that year by the Italian corporations. That method of reporting was in accordance with petitioner's practice, in 1939 and subsequent years, of reporting items of foreign income, blocked by exchange restrictions, at the time of actual receipt, and treating them as capital gain items with a cost basis of zero. The dividends in controversy were not unqualifiedly subject to petitioner's demand in the year 1939. In 1939 there was no market for the unconverted Brazilian milreis and the Italian lire here in controversy, and no one could form an opinion as to their values in that year. Issue 3 During 1942 petitioner paid out as "salaries" the gross sum of $37,620.44. The net amounts so paid were in fact embezzled by the paymaster and were not received by the employees designated on the checks as payees. The total sum of $37,620.44 was deducted in good faith as part of cost of sales. In addition, based upon the above "salaries," petitioner withheld and paid to the Treasury, as the employer's portion of Federal Old Age Benefit, the amount of $357.39, and as Federal Unemployment Insurance the amount of $676.55. The latter sums were *168 deducted in good faith. In 1948 petitioner discovered the embezzlements and made a claim for reimbursement from its surety under its policy of insurance which was in effect at all times. In 1949, under the terms of its policy, petitioner received from the surety reimbursement of the above sum of $37,620.44, without interest. Respondent's notice of deficiency, mailed on December 14, 1948, did not disallow any of the above sums. At the hearing, respondent claimed an additional deficiency based upon the disallowance of the amount of $37,620.44 as a deduction for 1942. Issue 4 Petitioner had no excess profits tax liability for 1941, and in so determining, respondent excluded from petitioner's excess profits net income for that year the sum of $436,945.36 as abnormal income under section 721 of the Internal Revenue Code. Respondent's computation of petitioner's unused excess profits tax credit carry-over from 1941 to 1942 did not exclude from petitioner's excess profits net income for 1941 the said amount of $436,945.36. Opinion I. Issue 1 (a) Although perhaps not conforming technically to the definition of a hedge, [1] it seems indisputable as our *169 findings show that petitioner's practice of purchasing corn futures was an integral part of its manufacturing business. Ben Grote, 41 B.T.A. 247; see Kenneth S. Battelle, 47 B.T.A. 117, 127. It would hence be anomalous to view them as purely speculative transactions of a capital nature, [2] especially considering that this is "largely a factual question," Kenneth S. Battelle, supra, 125, and the burden here is on petitioner to show that it incorrectly treated the losses as ordinary on its original tax returns. Only by so doing can it succeed in maintaining its present position that losses in the base period were improperly employed to arrive at a smaller income than actually received. *170 Futures contracts need not be concurrent with spot transactions in order to be a hedge. G.C.M. 17322 (1936), XV-2, C.B., 151. In neither TennesseeEgg Co., 47 B.T.A. 558, nor Estate of Dorothy Makransky, 5 T.C. 397, affirmed (C.A. 3), 154 Fed. (2d) 59, were there future commitments against which the futures purchased could operate as an offset. In the former, petitioner's failure to sustain its burden of proof is emphasized, and in the latter the venture in question was an isolated transaction and not a component of a regular practice of balancing transactions systematically conducted. Neither case is authority militating against our conclusion that petitioner's losses on its futures contracts were properly treated as ordinary losses. Stewart Silk Corp., 9 T.C. 174, 179. II. Issue 1 (b) Petitioner's alternative contention that Internal Revenue Code, section 118, forbade deduction of these losses as wash sales must be rejected on authority of Corn Products Refining Co., 16 T.C. 395, a prior decision involving this same petitioner from which we see no reason to depart. *171 III. Issue 1 (c) That the futures contracts gave rise to a separate class of losses, however, we think admits of little doubt. Although related to petitioner's cost of operations, they cannot be considered an inventory item, Modesto Dry Yard, Inc., 14 T.C. 374, nor, since the grain itself was never acquired, a part of the cost of goods sold. See TennesseeEgg Co., supra., Estate of Dorothy Makransky, supra; Modesto Dry Yard, Inc., supra.Being losses on transactions comparable to hedges, they are strictly similar only to other hedge transactions. We conclude that, being greater than 125 per cent of previous items of the same character, the losses are subject to treatment under section 711 (b) (1) (J) (ii). Green Bay Lumber Co., 3 T.C. 824; Welch Grape Juice Co., 9 T.C. 786; Mine and Smelter Supply Co., 10 T.C. 1179. For the first time on brief, respondent seeks to invoke the provisions of section 711 (b) (1) (K). Assuming that the ordinary burden of disclosure rested upon petitioner in that *172 state of the record, but see Green Bay Lumber Co., supra; Wentworth Manufacturing Co., 6 T.C. 1201, it has in our view been adequately met. There is no apparent causal connection between the losses on futures and the gross income or deductions of petitioner's operations. And the abnormal losses do not seem to have been a consequence of a change in the manner and scope of petitioner's operations. R. C. Harvey Co., 5 T.C. 431; Laredo Bridge Co., 7 T.C. 17. If there are more obscure connections between the contested losses and any of the enumerated aspects of petitioner's activities as described in section 711 (b) (1) (K), it was incumbent on respondent to give some adequate notice of his proposed position. A taxpayer cannot be expected to negative every possible element of some hypothetical defense. Wentworth Manufacturing Co., supra. In this respect respondent's determination was erroneous. IV. Issue 2 On petitioner's claim that it understated its 1939 income by failing to report dividends received in Brazil and *173 Italy, we conclude that the burden of proof which rested on petitioner has not been discharged. It is not sufficient for the dividends to have been received in foreign territory. They must have been convertible into American dollars before petitioner could be charged with them as income. Foundation Co., 14 T.C. 1333. This was one of the issues in the case and proof of convertibility was requisite under the circumstances. International Mortgage & Investment Corp., 36 B.T.A. 187. In Weil v. Commissioner ( C.A. 2), 150 Fed. (2d) 950, the taxpayer had the burden of proving the absence of free convertibility, rather than as here, its presence, and failed to carry it. Petitioner's failure to sustain its burden in this respect is the basis for our conclusion contained in the findings that there was no market for the foreign exchange in dispute. In fact, what evidence there is indicates that these payments were actually blocked by the respective exchange restrictions of the countries involved. The facts show that except for a small portion actually converted *174 in some manner not disclosed, and not here in controversy, the entire amount was credited to deferred income. This was stated to be petitioner's method of dealing with blocked funds: "If the foreign dividend payable to us was blocked by exchange restrictions our practice was to book the dividend as a receivable at the prevailing rate of exchange, offset by a credit to the deferred income, taking it into income in the year it was received." When the dividends were "received," that is, when they were exchanged into dollars and transferred to the United States - all of which occurred subsequent to the year in issue - and not until then were they recorded as income. On this issue the deficiency is sustained. V. Issue 3. We do not view the issue affirmatively raised by respondent as one directly involving the deductibility of an embezzlement loss. At the close of the taxable year in question, 1942, from all that was then known, petitioner correctly deducted the amounts in issue as compensation for services. The fact that six years later it was discovered that these items had never been paid to the employees but had been misappropriated and that a year after that petitioner was able *175 to collect from its insurer would, as in E. B. Elliott Co., 45 B.T.A. 82, be pertinent facts for consideration if the year 1942 could be dealt with in reliance upon them. But as we have frequently reiterated, the Elliott rule no longer applies. Stanard-Tilton Milling Co., 3 T.C. 1026; Taylor Instrument Companies, 14 T.C. 388. Only by reviewing the year in controversy in the light of facts discovered many years later can petitioner's position be attacked. This as we have said we are no longer in a position to do. Schwabacher Hardware Co., 45 B.T.A. 699, was decided after E. B. Elliott Co., supra, and on its authority, and before Stanard-Tilton Milling Co., supra.For that reason it has no application to these proceedings. And in Samuel M. Felton, 5 T.C. 256, the burden was not upon respondent, as it is here, but upon petitioner. Under the Security Flour Mills [3] rule, respondent has not even closely approximated the discharge of the burden which he is required to bear. On this issue, decision will be for petitioner.
*176 Issue 4 The final question is controlled by San Francisco Stevedoring Co., 8 T.C. 222, as petitioner concedes. It attacks the conclusion there reached and urges us to depart from it. This we are unwilling to do. On the authority of that case, the deficiency is sustained in this respect. Decision will be entered under Rule 50. Footnotes
1. "* * * to hedge, i.e., to insure themselves against loss by unfavorable changes in price at the time of actual delivery of what they have to sell or buy in their business; * * *." United States v. New York Coffee & Sugar Exchange, Inc., 263 U.S. 611. See Patterson, "Hedging and Wagering on Produce Exchanges," (1931), 40 Yale L.J., 843, 846↩. 2. "* * * For example, if a manufacture or processor of raw materials is short on inventory and makes sales of his finished products for forward delivery, the appropriate hedging transaction in that instance would be the purchase of raw material futures at or about the time he makes the sale." Stewart Silk Corp., 9 T.C. 174, 178↩.
3. Security Flour Mills v. Commissioner, 321 U.S. 281↩.