THE SAN FRANCISCO STEVEDORING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7775. Promulgated January 30, 1947.

*Arthur H. Kent, Esq.*, and *Valentine Brooks, Esq.*, for the petitioner.

*T. M. Mather, Esq., A. James Hurley, Esq.*, and *Paul E. Treusch, Esq.*, for the respondent.

Murdock, *Judge*: The Commissioner determined a deficiency of $2,928.81 in the petitioner's excess profits tax for the calendar year 1942. The first issue for decision is whether $5,499.24 should have been accrued as income for the year 1939, thus increasing the income of the base period. The facts have been stipulated and the stipulation is adopted as the findings of fact.

The petitioner is a California corporation. Its return for 1942 was filed with the collector of internal revenue for the northern district of California.

The petitioner kept its books and made its returns at all times material hereto upon a calendar year basis, using an accrual method of accounting.

The petitioner was a member in 1939 of the Waterfront Employers Association of San Francisco (hereinafter referred to as San Francisco). San Francisco was a nonprofit California corporation organized in 1935 for the purpose of representing its members in their relations with labor. The petitioner was also a member in 1939 of the Waterfront Employers Association of the Pacific Coast (hereinafter referred to as Coast). Coast was a nonprofit California corporation organized in 1937 for the purpose of representing its members in their relations with labor. Its membership was similar to that of San Francisco, except that it covered a wider area. A number of the directors of San Francisco in 1939 were also directors of Coast.

San Francisco had on hand in 1939 a surplus of $145,000, accumulated from dues and assessments. Its activities had been restricted by reason of the formation of Coast. The directors of Coast, on February 9, 1939, authorized a committee of Coast to meet with representatives of San Francisco to work out a plan for transferring to Coast the surplus of San Francisco, which would revert upon the liquidation of San Francisco to the individual members of Coast. A committee of San Francisco wrote a letter to the members of San Francisco, including the petitioner, on June 1, 1939, advising them of the efforts being made to transfer the San Francisco surplus to Coast, "to enable the latter to more effectively carry on its activities and replace the existing deficit in its treasury." The letter was in part as follows:

The San Francisco directors feel that such a transfer should be effected. The San Francisco directors also feel that the debt should be repaid by the Coast Association to the members of the San Francisco Association who contributed to the reserve as and when the Coast Board of Directors feels that conditions permit. This cannot be done without the consent of the members of the San Francisco Association, because it will result in a distribution of assets to the extent that repayment is made to members individually.

The effect of such a plan, if carried out, would be the following:

(1) The immediate creation of a substantial cash reserve for the Coast Association;

(2) An orderly method of liquidating the loan by payments to members of the San Francisco Association instead of the Association itself over a period, in proportion to their respective contributions to the funds of the San Francisco Association.

If the foregoing plan is acceptable to the membership, Price, Waterhouse & Company will be employed to assure that payments to members will be proportioned to their various contributions to the San Francisco surplus.

While the Board of Directors feels that it is within the power of the Association to make contributions to the Coast Association for the purpose of carrying on its activities, it seems equitable that provision should be made for the San Francisco members to ultimately receive the benefit of their respective contributions to the San Francisco surplus rather than to leave the surplus with the Coast Association or provide for its return to the San Francisco Association's treasury.

In order that the distribution to the members may be carried out it is necessary to secure the consent of the membership.

Your approximate share in the San Francisco surplus, subject to later verification by the auditors, is $————.

Enclosed is a self-addressed envelope together with a form for your approval. Please fill in and return at your earliest convenience.

All members of San Francisco, including the petitioner, returned signed consents by August 8, 1939. Each member agreed in the consent to the transfer of the funds to Coast, "in consideration of the undertaking by the Coast Association to repay said funds to the present members of the San Francisco Association as long as they shall continue to be such members, such repayments to be made as and when the Board of Directors of the Coast Association shall deem it advisable and practicable to make such repayments." The consent also authorized the directors of San Francisco to take such action as they deemed proper to transfer the funds to Coast and to provide for repayment by Coast "to the present members of the San Francisco Association in lieu of the latter Association itself" and "to provide specifically with the Coast Association that if any present member of the San Francisco Association shall cease to retain its membership while any balance of said funds remain [sic] unpaid to such former member, then such balance shall be paid to the San Francisco Association in lieu of being paid to such former member."

The firm of accountants rendered a report on July 19, 1939, showing the exact portion of the total of $145,000 to which each member of San Francisco would be entitled. The share of the petitioner was shown to be $5,499.24.

A. Boyd, secretary-treasurer of both San Francisco and Coast, sent a copy of the accountants' report of July 19, 1939, to the petitioner and to every other member of San Francisco and of Coast, together with a letter stating that the share of each member of San Francisco in the surplus being transferred to Coast as a loan was shown in the

accountants' report, consents had been received from all the members of San Francisco authorizing the transfer, the amount transferred would appear on the books of Coast as a loan from members of San Francisco, and credits would be set up on the books of Coast to the individual members of San Francisco, and when funds became available and the Coast Board determined to liquidate the loan, in whole or in part, payments would be made to the individual companies in proportion to their respective contributions as set forth in the accountants' report.

The $145,000 was carried on the books of Coast as a liability and shown on the balance sheet as "Advanced by members—W. E. A. of S. F."

Coast eventually paid the $145,000, without interest, to the members of San Francisco in four payments of 25 per cent each. The petitioner received payments of $1,374.81 on each of the following dates: February 14, 1941, October 20, 1943, January 17, 1944, and February 14, 1944. The petitioner did not accrue on its books or report in its return the $5,499.24 as income in 1939, but it reported each payment as income when received in the later years.

Several of the 1939 members of San Francisco later ceased operations in that territory, due to war conditions, and were no longer members of San Francisco when Coast made the payments above described. Coast made payments to each of them in full in the same manner that it made payment to those which, like the petitioner, continued to be members of San Francisco.

The petitioner did not receive or acquire the right to any dividends on stock or on memberships in corporations, or any distribution from San Francisco or Coast, during the years 1936 to 1940, inclusive, unless the loan made in 1939 by San Francisco to Coast constitutes a dividend accruable to the petitioner in 1939.

The petitioner, which did not accrue in 1939 the $5,499.24 here in controversy, now argues that, as a matter of law and proper accounting, it was required to accrue the item at that time as an amount due from Coast and it is entitled to the benefit of an accrual in 1939 in so far as the accrual affects its excess profits tax liability for 1942. The petitioner does not claim constructive receipt of a dividend from San Francisco in 1939. The parties agree on the general principles of law applicable. A taxpayer, using an accrual method of accounting, must accrue an item in the year in which the taxpayer acquires a fixed and unconditional right to receive the amount, even though actual payment is to be deferred. There must be no contingency or unreasonable uncertainty qualifying the payment or receipt. Income does not accrue to a taxpayer using an accrual method until there arises in him a fixed or unconditional right to receive it. *United*

*States* .v. *Anderson*, 269 U. S. 422; *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290; *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182; *United States* v. *Safety Car Heating & Lighting Co.*, 297 U. S. 88; *Putnam's Estate* v. *Commissioner*, 324 U. S. 393; *H. Liebes & Co.* v. *Commissioner*, 90 Fed. (2d) 932; Mertens Law of Federal Income Taxation, sec. 12.60. The time when an item accrues is largely a question of fact, to be determined in each case. It is hereby found as an ultimate fact, that the item here in question did not accrue in 1939.

It could not have been said in 1939 that there was no contingency or unreasonable uncertainty qualifying the payment to the petitioner of the amount in question. Coast had apparently supplanted San Francisco to the extent, at least, that San Francisco no longer needed this surplus of $145,000. If San Francisco had been liquidated at that time, all of the $145,000 would have been paid to members of San Francisco who were also members of Coast. Coast needed this money in order to carry on the labor relations of those members. The amount which the petitioner was to get was fixed, but, so far as this record shows, it was not only uncertain in 1939 as to just when Coast would pay the money to the petitioner, but it was also uncertain as to whether it would ever pay it. It is stated in the stipulation of facts that Coast needed the money to carry on its activities more effectively and to replace the "existing deficit" in its treasury. If it did not realize income, it would not be able to make the payments. Coast was not required to repay the money at any certain time, but only when Coast had funds available and its board of directors should decide to liquidate the loan. That time might never come. No interest was to be paid and no security was given. Furthermore, under repeated statements in the written documents used in arranging the transaction, the right of any 1939 member of San Francisco to receive its proportionate share, when the directors of Coast might see fit to pay it, was conditioned upon its continued membership in San Francisco. This latter condition was apparently waived, but it was a condition imposed in 1939 to which the petitioner had expressly agreed in writing. It would not be proper to conclude from the facts as stipulated that it could not have been raised successfully when the payments were made. These circumstances and all of the other facts set forth in the stipulation have been taken into account in reaching the conclusion stated above.

The petitioner claims, in the alternative, that the payment received in 1941 was abnormal income which should not have been included in excess profits net income for 1941 and, as a result, the petitioner's unused excess profits credit carry-over for 1942 has been understated. The parties are not in disagreement as to the method of computation or as to the amount of the excess profits credit for 1941. The re-

spondent agrees with the petitioner that the item of $1.374.81 received in 1941 was abnormal income which would be attributed in its entirety to a prior year (1939) if a computation of excess profits tax for 1941 were being made under section 721. The parties likewise seem to agree that the excess profits credit for 1941 exceeds excess profits net income for 1941, regardless of whether the item of $1,374.81 is or is not included in excess profits net income of 1941, and, consequently, there is no excess profits tax liability for 1941. The difference between them is as to how much of the 1941 credit is left to be carried over to 1942 after it is applied to wipe out excess profits net income for 1941. The petitioner contends that $1,374.81 of the amount which the respondent has included in excess profits net income must be attributed, under section 721, to a prior year and thus excluded from excess profits net income for 1941. It has failed to call attention to statutory authority in support of this contention. The petitioner has not proved just what the Commissioner did in this respect, but his present attitude in arguing this point indicates that the $1,374.81 is a part of the 1941 excess profits net income as computed by the respondent.

It is provided in section 710 (c) (2) that the term "unused excess profits credit" means the excess, if any, of the excess profits credit over the excess profits net income. Excess profits net income for 1941 is defined in section 711 (a) as the normal tax net income, except for certain adjustments not here material. It is not disputed and it could not be disputed that the amount of $1,374.81 was a part of the petitioner's normal tax net income of 1941.

This would seem to conclude the matter in favor of the respondent, but the petitioner contends that excess profits net income for 1941 is to be determined under section 721 rather than under section 711 (a). Or, perhaps its argument is that 721 requires an adjustment. The statute does not support this contention. The purpose of 721 is to make certain that the excess profits tax for a taxable year in question shall not exceed the tax as provided in 721. The petitioner had no excess profits tax whatsoever for 1941 (the credit exceeded its excess profits net income) and, consequently, section 721 has no application to that year. There is nothing to indicate that one of the purposes of section 721 was to reallocate normal tax net income to prior years so as to increase the excess profits credit carryover by reducing excess profits net income. The application of 721 may bring about a less onerous excess profits tax than would otherwise be due for any particular year, but it does not apply so as to increase the excess profits credit carry-over of a year for which no excess profits tax is due. It is provided in 721 (e) that the section shall be applied only for the purpose of computing the tax under **Subchapter E** for the current taxable year or for a future taxable

year. Clearly, it has no application to the prior taxable year, 1941, in this case; for, since the excess profits credit for 1941 was sufficient to wipe out excess profits net income, there was no excess profits tax for that year and no occasion to apply section 721. The carry-over of excess profits tax credit of 1941 to 1942 in such a case is only the amount of the credit which is left after fully offsetting the excess profits net income of 1941 without in any way applying section 721 in the computation of that excess profits net income.

*Decision will be entered for the respondent.*