COMMERCIAL SOLVENTS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 87814, 1574–62.    Filed May 28, 1964.

*Gilbert I. Falk*, for the petitioner.
*Warren S. Shine*, for the respondent.

ARUNDELL, *Judge:* In these consolidated proceedings the respondent determined deficiencies in income tax for the calendar years 1951 and 1954 through 1957 in amounts as follows:

| Year | Docket No. | Deficiency |
| --- | --- | --- |
| 1951 | 87814 | $6, 437. 50 |
| 1954 | 1574–62 | 21, 419. 58 |
| 1955 | 1574–62 | 26, 344. 98 |
| 1956 | 1574–62 | 26, 078. 76 |
| 1957 | 1574–62 | 329, 456. 44 |

Two issues are presented: (1) Whether during all the years here involved petitioner received capital gains or ordinary income as the result of a contract entered into with Kyowa Fermentation Industry Co., Ltd., on August 6, 1951; and (2) whether petitioner realized management fees subject to tax in the amount of $50,833.33 in 1956 and $616,666.67 in 1957 from Northwest Nitro-Chemicals, Ltd.

The parties filed a stipulation of facts to which was attached 45 exhibits.    There was no oral testimony.

### FINDINGS OF FACT

The stipulated facts are so found and are incorporated herein by this reference.

Petitioner is a corporation organized in 1919 and existing under the laws of the State of Maryland with its principal office in New York, N.Y. Its returns for the years here involved were filed with the district director of internal revenue in Upper Manhattan (now Manhattan), New York, N.Y.

Petitioner's common stock is traded on the New York Stock Exchange. It was organized to manufacture, import, export, sell, purchase, and generally deal in and with chemicals, solvents, fertilizers, paints, varnishes, dyes, colors, pigments, and all kinds of merchandise entering into the manufacture of same, and all products and byproducts thereof. Petitioner used the accrual method of accounting, and it used the specific chargeoff method for bad debts during the years in issue.

Since its organization and until some time during February 1957 petitioner was a producer of acetone, butyl alcohol, and ethyl alcohol by the bacterial fermentation process described in the second following paragraph below.

Petitioner began manufacturing operations in May 1920 producing acetone, butanol (sometimes described as butyl alcohol or n-butyl alcohol), and a small amount of ethyl alcohol by a bacterial fermentation process using a corn mash. The process was developed and patented by Chaim Weizmann, an eminent British scientist. Exclusive rights to the use of this process were acquired by petitioner, and petitioner was the sole producer of acetone and butanol by bacterial fermentation until the rights expired in 1936 when others entered the field.

Acetone and butyl alcohol are produced by the action of bacteria on starches and sugars. A mash of carbohydrates of either amylaceous (starchy) or saccharine (sugary) nature is prepared by mixing nutrient material with water. Examples of amylaceous carbohydrates are maize, kaffir corn, wheat, and oats. Examples of saccharine carbohydrates are blackstrap molasses, hydrol, wood sugars, and xylose. After the carbohydrate material is mixed with water, it is subjected to a cooking process for the purpose of sterilizing the material and breaking it down into a form more easily acted upon by bacteria. After sterilization, the mash is cooled and inoculated with a culture of butyl alcohol and acetone-forming organisms. The mash is then allowed to ferment. After fermentation, the products, consisting essentially of butyl alcohol, acetone, and ethyl alcohol, in approximately the proportions by weight of 6:3:1, are separated and recovered by fractional distillation.

During 1922 the bacteria used by petitioner in the fermentation process suddenly and mysteriously ceased to function. Some fermentations yielded one-tenth of the normal amount of acetone and butyl alcohol, and many fermentations yielded none at all. Research and

experimentation led to the discovery that alien bacteria lurking in the factory piping had infected the fermentation bacteria with a disease that made the cultures impotent. As a result, petitioner developed an effective method of steam sterilization. This experience caused petitioner to increase the size of its laboratory and expand its research staff. A research and development program was begun which continued for many years. As a result of its research and development work, petitioner learned how to vary the yields of acetone, butanol, and ethyl alcohol from the fermentations through the employment of different strains of bacteria which it discovered and cultivated. Petitioner also discovered how to use cheaper raw materials in place of corn. Between August 7, 1934, and October 21, 1941, 26 U.S. patents were issued to petitioner on the fermentation process with respect to bacterial cultures, raw materials, equipment, and treating materials. The 26 patents are attached to the stipulation as Exhibit 1–A and are incorporated herein by this reference. They describe: (1) The increased yields of solvents as a percent of sugar contained in the fermentation mash, and (2) the increased yields of butyl alcohol as a percent of total solvent yield, which resulted from petitioner's research and development work. Petitioner never applied for or received any Japanese patents on the acetone-butanol-ethanol fermentation process.

Kyowa Fermentation Industry Co., Ltd. (now known as Kyowa Hakko Kogyo), hereinafter sometimes referred to as Kyowa, was organized under the laws of Japan on July 1, 1949, as successor to Kyowa Gangyo K. K., which was the successor to Toa Chemical Industry Co., Ltd., originally established in March 1943 at Hofu, Yamaguchi Prefecture, for the purpose of manufacturing aircraft fuel for the Japanese Army. Kyowa's principal office during the years in issue was located in Tokyo, Japan.

Kyowa was the first company in Japan to produce acetone and butanol through the utilization of waste molasses on a commmercial basis. By February 1959 it became the largest producer of solvents in Japan, with an annual production of 15,600 tons.

On September 15, 1950, Benzaburo Kato, as president of Kyowa, wrote a letter to Thomas S. Carswell, a vice president of petitioner, in which Kato stated that his company would be interested in obtaining petitioner's technical know-how with respect to the production of butanol and acetone by fermentation and gave the reasons therefor. In this letter Kato also stated:

If the percentage of butyl alcohol in the total solvents is increased by introducing into our process certain techniques and cultures used by Commercial Solvents Corporation, it may aid materially in increasing the percentage of butyl alcohol in our fermentations. If this should prove to be true, we will be able to pay some part of the additional profit accruing to our Company to Commercial

Solvents in the form of royalties. As to the amount of royalties, how to calculate and how to pay such royalties and other details connected with same, I am ready to discuss and negotiate with my utmost sincerity.

Petitioner's cultures produced a yield of butyl alcohol higher than the 3,000 long tons produced by Kyowa as set forth in Kato's letter.

Negotiations were thereafter carried out between petitioner and Kyowa, and an agreement, hereinafter sometimes referred to as the agreement, was entered into on August 6, 1951, as a result thereof. A copy of the 13-page agreement is attached to the stipulation as Exhibit 3–C and is incorporated herein by this reference. The pertinent parts of the agreement are paraphrased in these findings.

Petitioner, as first party to the agreement, was referred to as Solvents, and Kyowa, as second party, was referred to as Kyowa. Solvents represented that it had developed and was the owner of processes, know-how, and cultures (collectively referred to as processes) relating to the production of n-butyl alcohol, acetone, and ethyl alcohol by the fermentation of molasses-containing fermentation media. Kyowa represented that is was producing annually 6,600,000 pounds of solvents (n-butyl alcohol, acetone, and ethyl alcohol) by the fermentation of molasses-containing fermentation media, the solvents yield being about 29 percent of the amount of fermentable sugar in the molasses and consisting of 58 to 62 percent n-butyl alcohol, 27 to 33 percent acetone, and 7 to 12 percent alcohol. Kyowa also represented that it was desirous of acquiring the said processes (processes, know-how, and cultures) from Solvents "for the territory of Japan" for the purpose of improving its process and increasing its total solvents yield and in changing the ratios of solvents produced. For adequate consideration the parties then agreed, in paragraph (1), that Solvents would supply Kyowa with a true and accurate written report, showing the solvents yield and ratios, times of fermentation, concentrations of fermentable sugar, and such other data as may be necessary to enable Kyowa to determine the degree of improvement which may be effected in its process, using its customary types of molasses, by the use of Solvents' improvements, and, in paragraph (2), that Kyowa would, within 2 months after receipt of such report, notify Solvents, in writing whether it desired to acquire Solvents' said processes (processes, know-how, and cultures). Only in the event that Kyowa notified Solvents that it desired to acquire Solvents' said processes were the remaining provisions of the agreement to become effective.

On September 25, 1951, Kyowa officially notified petitioner that it desired to acquire the processes mentioned in the agreement of August 6, 1951. This made effective the remaining provisions or, as they were called, paragraphs, of the August 6, 1951 agreement which are now paraphrased.

Under paragraph (3), Solvents agreed to furnish Kyowa promptly with cultures and a detailed written description of its processes and up to two competent technicians for a period of not in excess of 2 months, if so requested by Kyowa.

Under paragraph (4), Solvents and Kyowa agreed that each would promptly advise the other of all improvements, patentable or unpatentable, made by either relating to the production of n-butyl alcohol, acetone, and ethyl alcohol by the fermentation of molasses-containing media. Solvents agreed to grant Kyowa a royalty-free exclusive license to use in Japan any such improvement made by Solvents in repect of which a patent would be issued, and Kyowa likewise agreed to grant Solvents a royalty-free exclusive license to use in the United States any such improvement made by Kyowa in respect of which a patent would be issued. (Petitioner's books and records show that no improvements in the fermentation process, and no licenses, were furnished to or received from Kyowa pursuant to paragraph (4).)

Under paragraph (5), Kyowa was to pay Solvents an amount equal to 10 percent of the total value of the improvements furnished by Solvents for a 5-year period. The value of the improvements was to be determined in part on the basis of a detailed report for a 6-month period ending June 30, 1951, called the base period, showing a mass of information relative to the exact amount of each material used, the total number of factory man-hours and the total quantities each of n-butyl alcohol, acetone, and ethyl alcohol produced during the base period. Kyowa was also to furnish a report setting forth (i) the highest total quantity of solvents ever produced by it during any 6-month period, and (ii) the dates of such 6-month period. A similar report to the one made for the base period was to be made by Kyowa for each 6-month period, called the installment period, during the 5-year period. By comparing each installment period report with the base period report, the total value to Kyowa during the installment period of the improvements in its process furnished by Solvents was determined, 10 percent of which value was payable to Solvents with the furnishings of the particular installment period report.

Paragraph (6) of the agreement provided:

On the date of delivery by SOLVENTS to KYOWA of the cultures and detailed description referred to in Paragraph (3) hereof, and simultaneously with such delivery, KYOWA shall pay to SOLVENTS the sum of Twenty-Five Thousand Dollars ($25,000.00). Such sum shall constitute a credit against which installments payable hereunder by KYOWA to SOLVENTS shall be charged until such installments exceed such sum provided, however, that, should installments payable hereunder by KYOWA never exceed such sum, SOLVENTS shall nevertheless be entitled to retain the whole thereof as payment for selling such cultures and detailed description.

Under paragraph (8), Kyowa agreed to keep full, true, and ac-

curate books of account, the inspection of which was at all times open to Solvents.

Under paragraph (9), Kyowa agreed to exercise its best efforts to prevent any cultures, know-how, or other technical information "sold to it in accordance with the terms of this agreement" from being made available to or coming into the possession of anyone without prior permission in writing from Solvents.

Paragraph (10) of the agreement provided:

KYOWA shall have the exclusive right, in so far as SOLVENTS is able to give KYOWA such right, to make, use and vend in Japan products resulting from the use of the processes sold hereunder, provided, however, that SOLVENTS shall have the right to sell similar products of its own manufacture in Japan. KYOWA shall, of course, have the right to use and vend outside Japan products resulting from the use of the processes sold hereunder.

Paragraph (12) provided that a waiver by either party of any breach of any provision of the agreement was not to be construed as, or constitute, a continuing waiver, or a waiver of any other breach, of any provision of the agreement.

The final paragraph (15) provided that the agreement could not be assigned by either party without the written consent of the other party.

In the years 1949 through 1956 petitioner did not sell or ship any acetone, butyl alcohol, or ethyl alcohol to Japan. Records prior to 1949 are not available. On March 13, 1957, petitioner sold, F.A.S. New York, to Toyomenka, Inc., 79 Wall Street, New York 5, N.Y., for shipment to Yokohama, Japan, 44,400 pounds of n-butyl alcohol for $6,959.70, and on May 31, 1957, 46,990 pounds of n-butyl alcohol for $7,365.75. In 1958 petitioner did not sell or ship any of the aforesaid products to Japan. In 1959 petitioner sold and shipped four gallons of ethyl alcohol to Japan.

These shipments of butyl alcohol in 1957 were made because there was a severe shortage of raw materials in Japan in 1957.

Under the terms of the agreement dated August 6, 1951, petitioner received the following income from Kyowa:

| Year | Amount |
|------|--------|
| 1951 | [1] $25,000 |
| 1952 | None |
| 1953 | 39,213 |
| 1954 | 82,383 |
| 1955 | 97,574 |
| 1956 | 96,588 |
| 1957 | 32,556 |

[1] Referred to in par. (6) of the agreement.

On petitioner's Federal income tax returns for the years 1951 and 1954 through 1957 petitioner reported the above-mentioned income received in those years from Kyowa as long-term capital gain.

Petitioner's fermentation process for the production of acetone, butanol, and ethyl alcohol was a secret process which petitioner owned for more than 6 months prior to August 6, 1951. At the time the agreement was entered into, petitioner did not hold its fermentation process primarily for sale to customers in the ordinary course of trade or business.

### ULTIMATE FINDINGS OF FACT AS TO FIRST ISSUE

1. Petitioner did not transfer all substantial rights in its secret processes to Kyowa under the August 6, 1951, agreement.

2. Petitioner retained rights in said processes which were of value.

3. Petitioner did not sell or exchange the secret process in issue, and the income therefrom received from Kyowa was taxable as ordinary income.

### *Issue 2*

Northwest Nitro-Chemicals, Ltd., hereinafter sometimes referred to as Northwest, was incorporated on August 9, 1954, under the laws of Alberta, Canada, for the purpose of constructing and operating a synthetic fertilizer plant and engaging in the business of manufacturing, distributing, and selling fertilizers.

The authorized capital of Northwest consisted of 10,000 shares of 5 percent preferred stock, Can$100 par value each, and 5 million shares of common stock, 1 cent (Canadian) par value each. The funds necessary to construct the plant and put it into operation, including funds for the acquisition of land, construction of plant, and working capital, in the amount of approximately $21,400,000, were raised principally through:

(1) The sale to the Royal Bank of Canada, hereinafter sometimes referred to as the Bank, of Can$12 million principal amount of first mortgage 4½ percent serial bonds, payable in installments from 1958 to 1962 and issued under a deed of trust and mortgage dated January 2, 1956;

(2) The sale to the public, through underwriters, in 1955 of US$8,500,000 principal amount of 10-year 5½ percent subordinate income debentures, hereinafter sometimes referred to as the debentures, due July 31, 1965;

(3) The sale to the public, through underwriters, in 1955 of 300,000 shares of common stock, at an aggregate price of US$450,000; and

(4) The sale to petitioner and New British Dominion Oil Co., Ltd., the prospective supplier to Northwest of natural gas needed in its operation, of 10,000 shares of preferred stock, at an aggregate price of Can$1 million.

The debentures were sold in units of $50 each, thus making 170,000 units. With each unit the purchaser received five shares of common

stock. Each unit with the stock was sold for US$50. There were 850,000 shares of common stock issued in this manner.

In addition, upon its organization, Northwest had issued 2,600,000 shares of its common stock at par for an aggregate amount of Can-$26,000.

After the completion of the financing referred to above, petitioner was the owner of the largest single blocks of the debentures ($1 million) ; of preferred stock (66⅔ percent) ; and of common stock (approximately 43 percent) of Northwest issued and outstanding.

An additional investment by petitioner was made during September 1957 in the common and preferred stocks of Northwest, increasing its percentage of the common stock of Northwest to 52.7 percent and its percentage of the preferred stock of Northwest to 83.4 percent. The cost to petitioner of the additional investment in the common and preferred stock of Northwest made in September 1957 was $1,102,313.

The first mortgage bonds sold to the bank were issued to mature at the rate of $1 million semiannually on January 2 and July 2 of each year, commencing January 2, 1958, until July 2, 1961. The unpaid principal balance of $4 million was to be payable on January 2, 1962. Interest at the rate of 4½ percent was payable semiannually on January 2 and July 2 of each year.

The debentures were dated August 1, 1955, to mature July 31, 1965. They were issued under a trust indenture executed by Northwest in favor of Chemical Corn Exchange Bank in the city of New York to bear fixed interest at the rate of 5½ percent per annum, payable on the first days of November and May for the period commencing August 1, 1955, and ending November 1, 1957. Commencing November 1, 1957, the debentures were to bear cumulative interest at the rate of 5½ percent, payable on May 1 and November 1, in each year, commencing May 1, 1958, which, prior to the maturity of the debentures, was payable only out of available net income for the preceding fiscal year. Any deficiency in payment of cumulative interest was to accumulate and was to be payable on any subsequent interest date or dates to the extent that there would be sufficient available net income for the preceding fiscal year for such purpose, and was to be payable in any event on the maturity of the debentures, whether by lapse of time, by redemption, by declaration, or otherwise.

The holders of the preferred shares were not entitled to receive notice of or attend meetings of shareholders or vote thereat except in respect of the dissolution of Northwest, or the sale of its assets or a substantial part thereof, or when full cumulative dividends for four quarterly dividend periods, whether or not consecutive, upon the preferred shares should be unpaid, after which they were to have the exclusive right to elect two directors of the company, such rights

ceasing when full cumulative dividends upon the preferred shares were to have been paid, or declared and set apart for payment.

The common shares were entitled to one vote per share and ranked after the preferred shares both as regards dividends and distribution of assets. Under the first mortgage trust deed no dividends could be paid on any of Northwest's common stock so long as any first mortgage bonds are outstanding.

As of March 1, 1955, Northwest entered into a management agreement with petitioner for a period of 10 years. Under this agreement to manage Northwest's business, petitioner agreed, among other things, to furnish through individuals in its own organization all services of an executive and administrative nature which might be required by Northwest's board of directors in order to conduct the business of Northwest, to make available specialists of petitioner for consultations, and otherwise to assist Northwest in its operations. The executives of petitioner were to fill the offices of Northwest's president, vice presidents, secretary, treasurer, and controller. Prior to the commencement of commercial production by Northwest, petitioner was to be paid, in full compensation for its services to Northwest, 150 percent of the salaries or wages paid by petitioner to its officers and employees prorated on the basis of actual time spent by such persons on Northwest's affairs, plus reimbursement for traveling and out-of-pocket expenses. Commencing with the start-up of commercial production of any product by Northwest, petitioner was to be paid in U.S. dollars at the rate of $650,000 per year.

As of August 23, 1955, Northwest's principal officers included J. Albert Woods, director and president (who was also a director and president of petitioner), Maynard C. Wheeler, director and vice president (who was also a director and vice president of petitioner), Howard L. Sanders, director, vice president and treasurer (who was also a vice president and treasurer of petitioner), and Alexander R. Bergen, secretary and assistant treasurer (who was also secretary of petitioner).

By letter agreement dated November 7, 1955, the management agreement was amended as of October 27, 1955, to provide, in pertinent part, that petitioner would not be required to provide from or through its organization an individual for the office of president of Northwest, and that the rate of compensation thereunder would accordingly be reduced from US$650,000 to US$610,000 per year. By letter agreement dated December 2, 1957, the letter agreement dated November 7, 1955 (amending the management agreement), was itself terminated and canceled, reinstating the management agreement in its original form, effective as of November 1, 1957.

Northwest commenced commercial operations in December 1956. Petitioner accrued in its books and reported as taxable income in its

income tax return for 1956 the sum of $50,833.33 as management fees earned in December 1956, which represented one-twelfth of the then effective annual management fee rate of $610,000. The sum of $616,666.67 was accrued on petitioner's books for 1957 as income from management fees earned during said year for 10 months at the rate of $610,000 per year and 2 months at the rate of $650,000 per year but the amount of $616,666.67 was not reported by petitioner as taxable income for 1957. An operating loss was incurred for the month of December 1956 in the amount of $224,293, including management fees.

An operating loss was incurred by Northwest for the first 6 months of 1957 in the amount of $1,428,546, including management fees. On June 30, 1957, Northwest had current assets of $2,312,768 and current liabilities of $3,703,349, including management fees.

On or about January 31, 1957, Northwest borrowed $1 million from the bank.

By letter dated July 5, 1957, from Northwest to the bank, Northwest advised the bank that it was necessary to have an immediate loan of $500,000 with probable additional loans between then and December 31, 1957, of $2,500,000 in order to operate its plant at the required full production. The reason therefor given by Northwest was the delay in its receiving the final $2 million takedown of the $12 million first mortgage bonds which Northwest had expected to receive from the bank prior to July 1, 1957, but which, because of delays in the completion of construction of one of the manufacturing plants of Northwest, was extended to October 1, 1957, pursuant to the bond purchase agreement under which the bonds were issued.

The letter to the bank of July 5, 1957, also stated that variations in the cash position of Northwest from the original feasibility report prepared in May 1955 resulted from the following:

(1) Delays in receipt of equipment and operational difficulties which prevented Northwest from reaching a total production figure close to the feasibility report until March 1957, instead of October 1956 as originally planned;

(2) As a result, production in early 1957 was insufficient to meet demand and orders had to be canceled;

(3) Currency differentials reduced the net back return; and

(4) Many production units which had been installed did not operate satisfactorily, necessitating changes and new equipment which increased the direct cost of the plant.

On July 17, 1957, Sanders, in the capacity of vice president of petitioner, wrote a letter to the bank concerning its management fee contract with Northwest, the body of which letter is as follows:

In connection with the revolving credit presently being negotiated between yourselves and Northwest Nitro-Chemicals Ltd., we understand that you have

raised the question regarding the actual payment to this corporation of the regular installments of its management fee.

The fee arises in connection with the management agreement between Northwest and Commercial Solvents Corporation dated March 1, 1955. Such agreement provides for payment to Commercial Solvents for CSC's services during "that portion of the term of this agreement which shall begin on the date on which such facilities shall begin the manufacture of any commodity on a commercial scale." The agreement further provides for the payment of such fees in advance in equal quarterly installments.

In spite of the wording above mentioned, although Northwest has accrued such fees on its books, it has yet to make its first payment of fee to Commercial Solvents. Furthermore, it is not the intention of Solvents to exact payment of the fee installments during the period or periods when Northwest finds it necessary to borrow money under its revolving credit arrangement. However, this should not under any circumstances be construed to mean that Commercial Solvents waives any payments or any contractual rights with respect thereto.

We trust this will give you fair indication of our intentions in this matter. Obviously, we do not expect your good bank to lend money to Northwest simply to pay management fees to Commercial Solvents Corporation.

On or about July 23, 1957, the supervisor of the bank sent the manager of the bank a telegram concerning Sanders' letter dated July 17, 1957. The telegram reads:

Northwest Nitro-Chemicals Ltd. Referring our telephone conversation this morning we certainly do not wish to be picayune about the form of postponement however we feel that something a little more definite than the "intention" expressed in letter July 17 is called for. We would be satisfied if the latter were altered to read in the second sentence, third paragraph "furthermore, Commercial Solvents Corporation undertakes not to exact payment or [sic] the fee installments during". Presumably you will arrange for alteration in the terminology.

On the following day, July 24, 1957, the supervisor of the bank wrote the manager of the bank, in part, as follows:

on further reflection it may be that the company for legal reasons will not wish to alter their letter from an "intention" as expressed to an "undertaking". Accordingly it will not be necessary to insist on the alteration of the letter as suggested in our telegram yesterday. * * *

On December 23, 1957, Sanders, who was then president of Northwest, wrote a letter to Woods who was still president of petitioner (CSC) and was then also the chairman of the board of Northwest, the body of which is as follows:

As you know, because of the tight financial position of this company during its initial year of operation we have withheld payment to Commercial Solvents Corporation of fees due under the management contract between us commencing with December 1, 1956. Earlier this year, CSC informed Royal Bank of Canada by letter that payment of such fees would not be enforced for the present time in order to assist this company in making adequate loan arrangements with the Royal Bank.

The question of payment procedure for these fees has been discussed by the writer with Mr. James Muir, President of the Royal Bank of Canada. The

bank has agreed to the postponement of the first payment under our mortgage bonds from January 2, 1958 to June 2, 1958, with the expectation that prior to that date this company will be able to clean up all, or essentially all, of its outstanding loan obligations to the bank. At that time suitable borrowing arrangements will be provided by Royal Bank so that this company can meet its obligations both under the mortgage bonds and under its contract with CSC. The bank recognizes that our obligation to CSC for management fees is long past due and they are anxious to place this company in a position to keep its debts on a current basis. Based on our cash forecast which has been reviewed with Mr. Muir, we expect to be placed in a position in June 1958, to at least pay to CSC all of our past due indebtedness as of December 31, 1957. At the same time, we will advise you of our intentions with respect to our 1958 obligation for management fees.

James Muir, referred to in the above letter as president of the bank, was also a director of Northwest.

On or about January 1, 1958, the management agreement between Northwest and petitioner, dated March 1, 1955, was again amended, effective as of January 1, 1958.

After several meetings and discussions between the bank and Northwest regarding the $1 million payment on the first mortgage bonds which matured on January 2, 1958, and the management fee, an agreement was reached on May 15, 1958, the material provisions of which are as follows:

Northwest Nitro-Chemicals Limited and Commercial Solvents Corporation in turn agree:

(a) The management fee of approximately $667,000 which has been accumulated up to January 1, 1958 is postponed until after July 1, 1959 and by a further agreement amongst the bank, Solvents and Northwest the amount cannot be paid except with 45 days prior notice to and the consent of the bank.

On June 2, 1958, petitioner's president wrote the bank's president a letter, the material part of which is as follows:

This Corporation hereby agrees with The Royal Bank of Canada that (a) until after July 1, 1959, it will not accept or receive any payment on account of the management fees mentioned above other than the $90,000 which is unconditionally payable for the fiscal year ending June 30, 1959, and (b) after July 1, 1959, it will accept or receive any such payment only upon 45 days' notice in writing to The Royal Bank of Canada.

As of July 1, 1959, the management agreement was again amended in particulars not material here. In a letter dated June 30, 1959, from petitioner to the bank enclosing a copy of the amended management agreement as of July 1, 1959, petitioner made reference to the $667,500 owing petitioner by Northwest for the period prior to January 1, 1958, saying petitioner "will not accept or receive any payment on account of the management fees mentioned above, other than said fees at the rate of $90,000 per annum which are unconditionally payable, without first giving 45 days' notice thereof in writing to you."

ULTIMATE FINDINGS OF FACT AS TO SECOND ISSUE

The management fees of $50,833.33 accrued during the month of December 1956 and are properly included in income for the taxable year 1956.

The management fees of $616,666.67 did not accrue during the taxable year 1957 and are not includable in income for the taxable year 1957.

OPINION

## Issue 1

In determining whether the income received from Kyowa during the taxable years here involved is long-term capital gain or ordinary income, we must, for the year 1951, look to section 117(a)(4)[1] of the Internal Revenue Code of 1939, and for the years 1954 through 1957, look to section 1222(3)[2] of the Internal Revenue Code of 1954.

The parties have stipulated that petitioner's fermentation process for the production of acetone, butanol, and ethyl alcohol was a "secret process" which petitioner had owned for more than 6 months prior to August 6, 1951, the date of the agreement between petitioner and Kyowa; and that at the time of the agreement petitioner did not hold its fermentation process primarily for sale to customers in the ordinary course of its trade or business. Such secret process was not property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year.

"It is well settled that secret processes may constitute property and be dealt with contractually as such." *Nelson* v. *Commissioner*, 203 F. 2d 1 (C.A. 6, 1953), reversing and remanding on other grounds a Memorandum Opinion of this Court.

Since the term "capital asset" means "property" held by the taxpayer, section 117(a)(1), *supra*, and section 1221, I.R.C. 1954,[3] the issue before us is narrowed to whether under the agreement of August

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.
  (a) DEFINITIONS.—As used in this chapter—
    (1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
      (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *
    (4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months * * *.
[2] SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.
  For purposes of this subtitle—
    * * * * * * *
    (3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months * * *.
[3] SEC. 1221. CAPITAL ASSET DEFINED.
  For purposes of this subtitle, the term "capital asset" means property held by the taxpayer * * *

6, 1951, there was a "sale" of petitioner's secret process to Kyowa. Petitioner contends that under this agreement there was a sale of its secret process; respondent contends otherwise. In support of their respective contentions both parties have cited *E. I. DuPont DeNemours & Co.* v. *United States*, 288 F. 2d 904, 909–912 (Ct. Cl. 1961), and *Stalker Corporation* v. *United States*, 209 F. Supp. 30 (E.D. Mich. 1962). Both of these cases dealt with whether there was a sale of a secret process, and, upon the particular facts present in those cases, both courts held that no sale occurred.

The court in the *Stalker* case, in determining whether or not there had been a sale of a trade secret, applied the tests used in determining whether or not there had been a sale of a patent, citing the *DuPont* case.

It is well settled that the transfer of the *exclusive* right to *make, use*, and *vend* a patented article for the full term of the patent results in an assignment, that is, a sale, rather than a mere licensing of the patent. *Waterman* v. *Mackenzie*, 138 U.S. 252 (1891); *Edward C. Myers*, 6 T.C. 258.

There is ample authority that the *exclusive* licensing of a patent within a given industry, *United States* v. *Carruthers*, 219 F. 2d 21 (C.A. 9, 1955), within a limited geographical location, *Vincent A. Marco*, 25 T.C. 544, appeal to C.A. 9 dismissed *nol. pros.* July 26, 1956, or within a given field of application, *William S. Rouverol*, 42 T.C. 186 (1964), results in the sale of the patent rather than a license.

The Supreme Court, in *Waterman* v. *Mackenzie, supra*, after stating the transfer of the exclusive right to *make, use,* and *vend* a patented article for the full term of the patent constituted a sale of the patent, said, "Any assignment or transfer, *short of one of these, is a mere license*, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement." (Emphasis added.)

Petitioner, in support of its contention that it transferred the exclusive right to make, use, and vend *in Japan* the products resulting from the use of the secret processes, relies upon paragraph (10) of the agreement set out in full in our findings. As we read paragraph (10), petitioner did not transfer to Kyowa the *exclusive* right to *sell in Japan* for the reason that paragraph (10) of the agreement contained a proviso that petitioner "shall have the right to sell similar products of its own manufacture in Japan." It would seem that by reason of this proviso, petitioner not only reserved the right to make, use, and vend in general but it specifically retained the right to vend in Japan, and since petitioner retained these rights it obviously could dispose of them to third parties.

Furthermore, under paragraph (9) of the agreement, Kyowa could make no disclosure of the secret process to anyone, not even to anyone in Japan, without prior permission in writing from petitioner. This

is not indicative of a sale of the process from petitioner to Kyowa. In the *DuPont* case, the Court of Claims, among other things, said:

It follows that the essential element of a trade secret which permits of ownership and which distinguishes it from other forms of ideas is the right in the discoverer to prevent unauthorized disclosure of the secret. No disposition of a trade secret is complete without some transfer of this right to prevent unauthorized disclosure.

In the instant case we do not think that petitioner, under the agreement, transferred to Kyowa any right to prevent unauthorized disclosure. As the court, in *Stalker Corporation* v. *United States*, said: "A transfer of anything less results in a transaction which is not a sale under the Code."

We hold that the income received by petitioner under the agreement of August 6, 1951, was taxable as ordinary income rather than as long-term capital gain.

*Issue 2*

Petitioner contends the management fees owed to petitioner by Northwest for the period December 1, 1956, to December 31, 1957, did not accrue as income to petitioner in 1956 and 1957, and, in the alternative, if the management fees due petitioner from Northwest for the month of December 1956 accrued as income to petitioner in 1956, such accrual of income should be reversed during 1957.

The parties are in agreement as to the law with respect to the accruability of income. Both parties cite *San Francisco Stevedoring Co.*, 8 T.C. 222, and *Standard Lumber Co.*, 35 T.C. 192, affirmed on another issue 299 F. 2d 382 (C.A. 9, 1962). These cases hold that under the accrual method of accounting, income is accruable when all the events have occurred which fix the right to receive the income, and the amount can be determined with reasonable accuracy. To the same effect is section 1.451–1(a) of the Income Tax Regulations which provides:

Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. * * *

In *San Francisco Stevedoring Co., supra,* we said:

A taxpayer, using an accrual method of accounting, must accrue an item in the year in which the taxpayer acquires a fixed and unconditional right to receive the amount, even though actual payment is to be deferred. There must be no contingency or unreasonable uncertainty qualifying the payment or receipt. Income does not accrue to a taxpayer using an accrual method until there arises in him a fixed or unconditional right to receive it. *United States* v. *Anderson*, 269 U.S. 422; *Continental Tie & Lumber Co.* v. *United States*, 286 U.S. 290; *Spring City Foundry Co.* v. *Commissioner*, 292 U.S. 182; *United States* v. *Safety Car Heating & Lighting Co.*, 297 U.S. 88; *Putnam's Estate* v. *Commissioner*, 324 U.S. 393; *H. Liebes & Co.* v. *Commissioner*, 90 Fed. (2d) 932;

Mertens Law of Federal Income Taxation, sec. 12.60. The time when an item accrues is largely a question of fact, to be determined in each case. * * *

We have found as ultimate facts that the $50,833.33 of fees accrued in 1956 but that the $616,666.67 of fees did not accrue in 1957.

At the end of 1956 Northwest's financial difficulties had not yet arisen. Although Northwest had sustained an operating loss for the month of December 1956, this was nothing unusual in the case of a business just beginning. All the events had occurred which fixed petitioner's unconditional right to receive the fee provided for in the management agreement dated March 1, 1955, as amended by the agreement effective as of October 27, 1955.

Beginning in 1957, Northwest began having financial difficulties. It started the year by borrowing $1 million from the bank. For the first 6 months it sustained an operating loss of $1,428,546. It commenced negotiations with the bank to establish a revolving credit arrangement. On July 5, 1957, it wrote the bank that it was in need of an immediate loan of $500,000 and would probably need another $2,500,000 before December 31, 1957, in order to operate its plant at full production. Before approving any loans to Northwest, the bank requested petitioner to waive its rights to payments of the management fees during the period that Northwest was indebted to the bank which petitioner in fact did. This is in effect substantiated by the letter from petitioner to the bank dated July 17, 1957, and by what occurred after 1957 set out in our findings. The events which occurred after 1957 were stipulated by the parties but objected to by the respondent in his brief as being irrelevant and immaterial. Of course, events occurring in a later year making payment doubtful are not relevant to the propriety of the accrual of the income in an earlier year. However, the events which we have set out in our findings which occurred after December 31, 1957, are found merely to substantiate the existence of the events in 1957 in which year petitioner gave up its right to receive payment of its management fee as long as Northwest was indebted to the bank. This modification of petitioner's management fee contract with Northwest was an event which made payment to petitioner uncertain so that no income accrued to petitioner in 1957 from the contract. It was not until February 22, 1960, that the Supreme Court of Alberta provided an installment basis under which petitioner was to receive payment of its fees earned prior to January 1, 1958, commencing June 30, 1961, and continuing to June 30, 1965.

We think the facts in the instant case are practically on all fours with the facts in *Standard Lumber Co., supra.* In that case the

taxpayer held debentures of another corporation. On or about December 31, 1953, the taxpayer executed a consent postponing the due date of principal and interest payments until an RFC loan was paid in full. The taxpayer also executed a "standby" agreement to induce the RFC to make advances to the other corporation. This agreement provided that the taxpayer would take no action to collect principal or interest under the debentures without written consent from the RFC as long as the other corporation was indebted to the RFC. We held that the postponed interest for 1954 on the debentures did not constitute accrued income taxable to the taxpayer in 1954.

In the instant case we think the contingency and uncertainty of the possible receipt by petitioner of its management fee for 1957 was too uncertain and too conditional to require its accrual as income in 1957. This is not a simple case of a delay in payment. This is a case where the expectation of payment ceased to exist until the occurrence of a future event. As the court said in *Corn Exchange Bank* v. *United States*, 37 F. 2d 34 (C.A. 2, 1930) :

The government should not tax under the claim of income, that which is not received during the taxable year and in all probability will not be paid within a reasonable time thereafter. When and if such income is received, it must be returned as such for the year received.

Regarding petitioner's alternative contention that if the management fees due petitioner from Northwest for the month of December 1956 accrued as income to petitioner in 1956, as we have previously held, such accrual of income should be reversed during 1957. We know of no authority in the law for such a holding. The fees either accrued as income in 1956 or they did not. We have found from the stipulated evidentiary facts that the fees accrued in 1956. Where uncollectibility of an accrued item develops in a later year, the taxpayer must usually seek his remedy in the bad debt or loss provisions of the Code. Cf. *Spring City Foundry Co.* v. *Commissioner*, 292 U.S. 613. Petitioner has made no claim for either a bad debt or a loss in connection with the accrual of the management fees for December 1956.

We find and hold that petitioner did not err in reporting the management fees of $50,833.33 as accrued taxable income in 1956, but that the respondent erred in determining that the $616,666.67 of management fees was accrued taxable income in 1957.

*Decisions will be entered under Rule 50.*