

Melvin Huffaker, Detroit, Mich., Carroll C. Grigsby, Detroit, Mich., on brief; Smith & Huffaker, Detroit, Mich., of counsel, for petitioner.

Melva M. Graney, Washington, D. C., Charles S. Lyon, Ellis N. Slack and Maryhelen Wigle, Washington, D. C., on brief, for respondent.

Before ALLEN, MARTIN and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

The taxpayer, Gilbert E. Nelson, has sought review of the decision of the Tax Court (one judge sitting), holding that payments of $7,960.32, $7,347.90, and $5,308.34, made to his mother in the respective taxable years 1945, 1946, and 1947, by the G. E. Nelson Company, a Michigan corporation of which he was the president and majority stockholder, were taxable to him as dividends constructively received.

We find from the record that the petitioner adduced substantial evidence to support the material allegations of his petition: that, during the tax years in issue, petitioner's mother, Mrs. Alma M. Nelson, was the proprietor of an unpatented invention and proprietary process for the spinning of

steel; that such process was invented by her deceased husband, Reynold G. Nelson, and retained by him when the G. E. Nelson Company was incorporated, for the reason that he did not desire such process to become a corporate asset but assigned it to his wife by an instrument in writing vesting in her the right to receive all royalties and other proceeds from the process; that, during the tax years in question, the G. E. Nelson Company used the process in manufacturing various items in the regular course of its business; and that the items so manufactured constituted the great bulk of its sales.

The record supports further allegations of the petition that during August, 1942, a contract in writing, between Reynold G. Nelson and the G. E. Nelson Company, was prepared which provided for his employment by that corporation at a salary equal to that paid his son, the taxpayer, plus twenty percent of the net profits during his lifetime, plus $300 per month to his wife (petitioner's mother) during her lifetime, should she survive him. This unexecuted document recited that "the parties have entered into certain agreements, both individual and mutual * * * and * * desire to have their several agreements and undertakings reduced to writing, thereby more fully and explicitly outlining and defining their several agreements and undertakings." This document was never signed, for the reason that Reynold G. Nelson became ill while negotiating for a provision that more money should be paid his wife by the corporation in the event that she should survive him. He died on February 19, 1943.

On or about September 15, 1942, he had executed in writing an assignment to his wife of all his rights in "all methods, processes, designs, tools, and machinery", designed or patented by him, or to which he was entitled to protection by virtue of invention and use, whether patented or not, "which processes, designs, and machinery are now used by said G. E. Nelson Company", it being his expressed intention to transfer to his wife all interest in the G. E. Nelson Company, together with all drawings, designs, methods of manufacture and

other incidents pertaining thereto, which were used by the corporation, or which it was entitled to use or to patent by virtue of his prior use or invention.

On March 25, 1943, the petitioner's mother, Mrs. Alma M. Nelson, entered into an agreement with the G. E. Nelson Company whereby she agreed to permit the company to use in the conduct of its business "all the rights, titles, and interests of any nature or kind whatsoever in and to all methods, processes, designs, tools and machinery, which have been designed or patented by the said Reynold G. Nelson or which the said Reynold G. Nelson * * * was and is entitled to protection by virtue of invention and use, whether same are patented or not, together with all processes, designs and machinery, and all drawings, designs, methods of manufacture and all other incidents pertaining thereto, which have been or are used by the party of the second part and to which the said Reynold G. Nelson was entitled to use and/or patent of by virtue of his said prior use or invention. It being the intention and desire of the party of the first part herein to allow the party of the second part the license and use of all property and methods of manufacture, which the party of the first part is now the owner of by virtue of assignment to her from the said Reynold G. Nelson, dated September 15, 1942, or otherwise, herein referred to."

This agreement was made for a period of one year and it was stipulated that the company would pay to petitioner's mother $500 on the date of the execution of the contract and $100 each week during the life of the agreement. Mrs. Nelson agreed to extend the contract for a period to be agreed upon, but in no event was it to be extended for a consideration less than that mentioned in the agreement. This original agreement was renewed for one-year periods by supplemental agreements dated respectively March 24, 1944, June 30, 1945, and June 29, 1946. Each supplemental agreement provided for payment of $100 per week, plus ten percent of the gross profits of the company, to the petitioner's mother. Both the original and the supplemental agreements were appropriately au-

thorized by unanimous vote at meetings of the stockholders.

The background of the situation existing when the contract between petitioner's mother and the corporation was executed, as found by the Tax Court, should be elucidating. Petitioner's father, Reynold G. Nelson, had devoted himself over a period of some twenty-five or thirty years to the development and improvement of techniques in metal spinning and had developed apparatus and mastered a method for spinning steel and heavier metals, controlling their dimensions and thicknesses. In September of 1935, he had organized a Michigan corporation, the Alrey Steel Products Company, of which he was president and owner of twenty-five percent of its capital stock. He had devoted his entire time to the business of his company during its existence. The company engaged in processing steel and other metals. Before it was organized, the elder Nelson had been granted a number of patents which he had assigned to The Spun Steel Corporation, by which he had been employed. A half interest in two patents was reassigned to Nelson and he, in turn, on October 12, 1935, assigned these interests to Alrey Steel Products Company, along with his interest in two other patents. The testimony of petitioner was to the effect that none of these patents was used by the G. E. Nelson Company. That company made use of the elder Nelson's formulas and designs independently of any patented matter.

The petitioner has claimed no interest in these patents. Indeed, they were introduced in evidence by the Commissioner of Internal Revenue in an effort to sustain his theory that the secret process which petitioner's father had assigned to petitioner's mother was the same process and method covered by the patents which the father had alienated long before with the result that the mother was proprietor of no secret process for the use of which she could be legitimately compensated by the G. E. Nelson Company. This argument of the Commissioner seems unjustifiable in the light of the facts revealed by the record.

Petitioner, at the age of twenty-four, entered the employ of the Alrey corpora-

tion and remained with it for four years during which time he learned the art of spinning metals. The Alrey Steel Products Company, without going through either a voluntary or an involuntary bankruptcy, ceased to do business in May, 1939, in consequence of a judicial sale of its entire assets to satisfy creditors, who, however, were not paid in full. Neither the petitioner, his father, nor his brother bought any of the assets of the company at such constable's sale.

Some of the machines of Alrey were sold to Detroit dealers from whom petitioner purchased several when he started in the business of metal spinning as a sole proprietor in June of 1939. At this time, his father turned over to him certain specimens of articles spun from steel which were thereafter used to show potential customers what could be produced. The original stock in the G. E. Nelson Company consisted of twenty-five hundred shares, of which 2410 shares were issued to petitioner and thirty shares each to his father, his brother, and to the secretary of the corporation. On September 16, 1942, the father transferred to petitioner's mother, pursuant to the assignment agreement of September 15, 1942, the thirty shares of the corporate stock owned by him. On October 5, 1945, petitioner transferred to his brother, C. Milton Nelson, 750 shares of the capital stock of the company. From October 5, 1945, to June 30, 1948, the stock of the corporation was held as follows: by petitioner, 1660 shares; by his brother, 780 shares; by his mother, 30 shares; and by the corporate secretary, 30 shares. Up to the time of his death, petitioner's father supported petitioner's mother, who had no independent income. In 1946, she received a dividend of thirty dollars on the thirty shares of G. E. Nelson Company stock. In her federal income tax return, Mrs. Nelson reported for the calendar years 1945, 1946 and 1947, that she had received from the G. E. Nelson Company for the process rights the respective sums of $7,960.32, $7,347.90 and $5,308.34. The Nelson corporation also reported in its income tax and declared value excess profits tax returns

identical amounts as payments for process rights.

. The Tax Judge included in his findings of fact, what from the record would appear to have been more appropriately termed a conclusion, the statement that the G. E. Nelson Company did not acquire from petitioner's mother on March 25, 1943, or on any subsequent date, the use of any secret process or of any valuable patented or unpatented process for the spinning of articles of manufacture from steel and the heavier metals. He made the further "finding of fact," which was likewise more realistically a conclusion, that the amounts paid to her during 1945, 1946, and 1947, did not constitute royalties, rents, or other fees for the use of any process which she made available to the corporation, but that they were paid to her by reason of the desire of petitioner that she should receive such amounts, and that the petitioner's dominant position in the G. E. Nelson Company enabled him to procure from the corporation such payments made to his mother.

In his opinion, the Tax Judge stated that he was unable to find that the mother had owned any secret, unpatented process for spinning steel and other heavier metals. He asserted that the testimony of petitioner was "vague, unsatisfactory, and evasive in this connection." The further statements were made in the opinion that, on the evidence, the sole proprietorship merely engaged in the same kind of activity previously conducted by the Alrey corporation and that, as new and more challenging tasks were presented to the sole proprietorship and later to the corporation, such tasks were handled simply by adapting and improving the technique and skill theretofore employed. It was said to be highly significant that there was a substantial continuity between the basic operations carried on by Alrey and by the business organized by petitioner in June of 1939.

The Tax Judge could observe no activities based upon any secret process. Further significance was said to inhere in the fact that petitioner's father had received no royalties or other compensation for the use of any process from the time the sole proprietorship was organized by the son

until September 15, 1942, when the assignments had been made by the father to petitioner's mother; and that no payments had been made thereafter, either to the father or to the mother, until one month after the father's death.

The royalty arrangement, moreover, was considered to be the outgrowth of earlier negotiations with petitioner's father looking toward provision for the mother after her husband's death. The opinion, declared: "Surely, it was a laudable purpose to provide for petitioner's mother, particularly since his mother apparently had no source of income of any consequence and since petitioner owed his success in the metal spinning business in large measure to his father's guidance. But that honorable purpose cannot convert into royalties or like payments the amounts which were thus paid over to petitioner's mother."

The opinion added that an additional element casting doubt on the genuineness of the payments in question as royalties was the fact that the amounts actually paid to petitioner's mother fell considerably short of the amounts required to be paid her by contract. It was suggested that the amounts actually paid her "were determined in such fashion as to provide for her needs or comfort, and were not true royalties or compensation for the use of a process." It was said further that there was substantial doubt under Michigan law as to the correctness of the Commissioner's argument that the petitioner was under legal obligation to support his mother and that the payments in question discharged that obligation. Nevertheless, it was thought that this would not prevent charging to the petitioner the amounts paid to his mother "if he in fact caused his corporation to make such payments."

We are not in accord with the conclusions drawn by the Tax Judge from the evidence in the case; and we think that he has erroneously called conclusions of law findings of fact, as heretofore indicated. But, if the so-called findings of fact be treated as such, we deem them clearly erroneous under the evidence disclosed by the entire record. Only two witnesses testified: namely, the petitioner and Paul E. Brun-

berg, an expert metallurgist. The Commissioner produced no witnesses but attempted to develop his defenses by cross-examination and documentary evidence. We think the Tax Judge was not justified in discarding the unimpeached testimony of these two witnesses.

In Cobb v. Commissioner of Internal Revenue, 6 Cir., 185 F.2d 255, 258, this court said: "None of this evidence was refuted. The respondent produced no witnesses. The fact that the Cobbs had entered into an oral partnership agreement was accepted by the Tax Court as true. Their testimony was in no wise shaken by what we in Rookwood Pottery Co. v. Commissioner, 6 Cir., 45 F.2d 43, termed 'destructive analysis.' We have repeatedly held that in such situation it became the duty of the Commissioner to decide the issue in accordance with the proof and of the Court to take the same view."

Our holding in the Cobb case was that a partnership between husband and wife had been demonstrated by the record to have had reality, and to have been entered into in good faith for a business purpose; and that the inference drawn by the Tax Court that it was a mere sham for the purpose of evading taxes was clearly erroneous.

In our judgment, there was amply adequate evidence in the record in the present case from the testimony of the petitioner, from the expert metallurgist, and from the documentary evidence to impel the conclusion that the payments to petitioner's mother were lawfully made for valuable considerations, and that such amounts should not have been taxed to the petitioner. We shall review briefly such evidence, endeavoring not to repeat what has already been stated.

The petitioner, Gilbert E. Nelson, testified that some thirty-five years ago his father had started to develop a line of spinning heavier metals and had acquired the "know-how" for such spinning by long experimentation and experience. He had developed a process and had formulas and specimens of unique use in metal spinning. The Nelson process involved ingenuity and did not consist alone in mechanical skill. The process was of particular use in controlling metal thicknesses on aircraft parts. The witness denied that such basic process was covered by any of the patents. He said that the original point of difference between the patented process and the secret process transferred to his company was the method of controlling the thickness and the dimensions of metals. By dimensions, the witness said he meant tolerances of the finished parts. He swore that the claims in the patents did not substantially cover the process used by the G. E. Nelson Company.

Petitioner testified further that, in taking the steps called for by the process, reference was sometimes made to the notes, sketches or drawings of his father which had been delivered to the company in pursuance of the contract between his mother and the company. He asserted that, in the spinning of metals, there are variables in the shape, thickness and contour of the finished product. He said that in getting the product to a finished shape, certain processes are used "to wind up with that shape." He stated that the variable is the weight of the metal or its alloy; and that his father, by trial and error, had acquired and passed along eventually to the petitioner's company the knowledge which enabled the latter to eliminate much of the hazard of proceeding by trial and error.

The petitioner swore that he had not learned to spin metal under his father's process until his company took over the process under contract with his mother. He stated positively that no items made by his company were manufactured under any of the patents which had been introduced in evidence. Asked if the machinery used had any special value, he replied: "It is the process that has the value." He declared that when dealing for the corporation with his mother he felt that she had a valid right to the process, the use of which she had transferred to his company for the valuable considerations heretofore described. He commented that he considered the payments to be made her under the contracts reasonable for the use of the process.

Petitioner was strongly corroborated in important portions of his testimony by the witness Paul E. Brunberg, an expert metallurgist of wide experience, who said

that upon inspection of petitioner's plant he had observed that, by use of the Nelson process, the company had apparently been able to displace heavily contained nickel alloy almost at will, which was "a little bit unusual metallurgically." He stated that "the thing that was remarkable was the control of the flow of this metal that normally is so difficult, as we say, to push around; that the plastic flow has been somewhat controlled in that thing, especially to some of the accurate limits that he is getting in his results." He added: "For example, he can go down to tolerances of around a thousandth of an inch, which is rather unusual in the spinning business."

Brunberg testified further: "Now, what Nelson has, Your Honor, I don't know. That is, I don't know his process. I haven't a concept of the secret process. I, however, would say, and with all the conviction I have, that that man has something, in the displacement particularly of the 19–9's up there that I saw, which is 19 nickel, 19 chromium, his inconels, and others I suppose. * * * But the thing that is really impressive here is the fact that they can displace these particular metals to a predetermined thickness and hold them there. It is remarkable. He has got something. If he hasn't anything else, he has got something there. And I doubt that the young man who was on this stand is old enough to have acquired all that particular art himself. That took some time. That took a good many years to acquire a background of that type.

"I saw some of the notes that were left by the father, sufficient to assure me that he did carry on an orderly flow sheet of what we base an orderly manufacturing procedure on. He left those, I saw one or two of those. I didn't care to see any more because I don't want to become involved in any one's secrets. I would say that he did have, and Nelson does have, a good mathematical basis of what he is doing."

The Tax Judge asked the expert witness: "Are you satisfied that what is involved here is a secret process of some sort that could be written out on paper, and sold to someone else, or whether what is involved is merely the skill of the particular operators working these machines?"

Brunberg replied: "Yes, I think he has a process, and I think it can be written out. I think it can be set up in each individual alloy the man is doing. And I think that he can schedule that among the various departments of his plant and maintain the confidential nature of its inception in the office." The witness asserted that some of the most important processes used commercially are not patented at all and gave several illustrations to demonstrate his point.

It is well settled that secret processes may constitute property and be dealt with contractually as such. Moreover, the courts will prevent the unlawful use of processes without the permission of the owner of the process. Durand v. Brown, 6 Cir., 236 F. 609; Allen-Qualley Co. v. Shellmar Products Co., D.C.Ill., 31 F.2d 293, affirmed 7 Cir., 36 F.2d 623; O. & W. Thum Co. v. Tloczynski, 114 Mich. 149, 72 N.W. 140, 38 L.R.A. 200; Glucol Manufacturing Co. v. Schulist, 239 Mich. 70, 214 N.W. 152; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, certiorari denied 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395; A. O. Smith Corp. v. Petroleum Iron Works Co., 6 Cir., 73 F.2d 531, 538, 539.

As should now clearly appear from our foregoing review of the evidence, the Tax Judge was clearly in error in holding that the payments made by the G. E. Nelson Company to petitioner's mother were gratuitous and without legal consideration and, therefore, constructively attributable taxwise to petitioner. The right to use the secret process owned by her, by conveyance from her husband, was a right which she could and did transfer lawfully to the corporation for valuable considerations. The Tax Judge improperly disregarded the testimony in the case in spelling out a gratuitous action on the part of her son in causing the corporation which he controlled to enter into a contract with his mother. Regardless of his affectionate motive and his inducement of generosity on the part of the corporation toward his mother, the transaction between her and

that legal entity was lawfully impeccable. The son was not discharging a legal liability to support his mother, for none such existed under Michigan law. See Schwanz v. Wujck, 163 Mich. 492, 494, 495, 128 N. W. 731, and cases there cited. In a free economy, courts are not permitted to make contracts for the parties, but merely to pass upon the legality of such contracts when made.

The decision of the Tax Court in the instant case seems inconsistent with its decision in Differential Steel Car Co., 16 T.C. 413.

The decision of the Tax Court is reversed, the deficiency assessments against the petitioner are held to have been erroneously made, and the cause is remanded to the Tax Court for further procedure in conformity with this opinion.

United States Court of Appeals
Ninth Circuit.