HENRY VOGT MACHINE COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Henry Vogt Mach. Co. v. Commissioner
Docket No. 21887-90
United States Tax Court
T.C. Memo 1993-371; 1993 Tax Ct. Memo LEXIS 380; 66 T.C.M. (CCH) 426; August 19, 1993, Filed *380 Decision will be entered under Rule 155. In January 1985, P, a domestic manufacturer of heat recovery equipment, entered into an agreement (the Yamada agreement) with K, a Japanese corporation engaged in the manufacture and sale of combustion boiler generators, whereby P granted to K a license to use P's technical data (the Data) to manufacture and sell a specific type of generator within a defined geographical area (the Region). P concedes that all payments received under the Yamada agreement are taxable as ordinary income. In late January or early February 1986, after being advised that long-term capital gain tax treatment could result if P sold the Data to K for use in the Region, P and K entered into another agreement (the Kubota agreement). The Kubota agreement was terminable at will by P after its initial 10-year term. After the execution of the Kubota agreement, P reported the payments from K as long-term capital gain received from the sale or exchange of the Data to K. R determined that such payments were received as royalty payments earned under a license agreement and therefore are taxable as ordinary income. Held: Because P reserved the right to disclose *381 the Data within the Region upon termination of the Kubota agreement, P retained substantial rights of value in the Data; consequently, the Kubota agreement did not effect a sale or exchange of the Data under sec. 1222(3), I.R.C.
Held further, the payments received by P under the Kubota agreement are royalty payments earned under a license agreement and therefore are taxable as ordinary income under sec. 61(a)(6), I.R.C.
For petitioner: Frederick E. Henry and Michael J. Wilczynski. For respondent: Joseph T. Ferrick and Lisa C. Smith. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioner's Federal income tax of $ 11,960 for fiscal year ended August 31, 1983, and $ 119,185 for fiscal year ended August 31, 1984. While the asserted deficiencies arise in petitioner's fiscal years 1983 and 1984, due to the generation of operating losses in these years and the application of the carryback/carryforward rules, the resulting deficiencies are for fiscal years 1985, 1986, and 1987. After concessions by the parties, the sole issue for decision is whether payments received by petitioner under an agreement to transfer technical *382 information and know-how to a Japanese corporation qualify for treatment as long-term capital gains under section 1222. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated by this reference. Petitioner, a corporation organized under the laws of Kentucky, had its principal office located at Louisville, Kentucky, at the time the petition herein was filed. For the years in issue, petitioner reported its income based on the accrual method of accounting and filed Federal income tax returns (Form 1120) on the basis of a fiscal year ended August 31. At all relevant times, petitioner's principal business activity was the design, manufacture, and sale of heat recovery equipment and products related thereto; petitioner was not in *383 the trade or business of selling technology. One of the products manufactured and sold by petitioner was a heat recovery steam generator (HRSG). A HRSG is a generator installed behind a gas turbine to recover the heat from the turbine's exhaust to produce steam. Because the steam produced is of high quality, it can be converted into electrical power or used in various industrial and commercial processes. Petitioner developed the technology to manufacture HRSG's in the 1960s and has owned the technology ever since. With the exception of a licensing agreement with Standard Fasel of Holland, the HRSG technology has at all times been confidential to petitioner, and petitioner has taken steps to maintain such confidentiality. Although an incidental portion of the HRSG technology was the subject of a U.S. patent, the HRSG technology consists of essentially unpatented engineering and manufacturing know-how. Through 1985, petitioner had manufactured and sold HRSG's for use in 79 projects worldwide. Although all such HRSG's were manufactured by petitioner in the United States, and many were installed in the United States, a small number were installed abroad in Iran, Korea, Holland, *384 the United Kingdom, and Brunei. Until 1985, petitioner did not actively pursue business in the Far East. In January 1985, petitioner and Kawasaki Heavy Industries (KHI), entered into a written agreement (the Yamada agreement) whereby petitioner granted KHI a 10-year license to use petitioner's HRSG technology in certain geographical areas. KHI is a Japanese corporation engaged in the design, manufacture, and sale of combustion boiler generators and other energy related products. (A combustion boiler generator is a different type of generator from a HRSG.) KHI unsuccessfully attempted to market its own HRSG, but it did not manufacture and sell HRSG's prior to the execution of the Yamada agreement in 1985. Pertinent terms of the Yamada agreement are as follows: WHEREAS, VOGT has for many years been engaged in designing, engineering, and manufacturing certain Products (as defined hereinafter) and has acquired considerable experience therein; and WHEREAS, VOGT is carrying on research and development work on said Products; and WHEREAS, KHI intends to undertake the manufacture of said Products and wishes to secure Vogt's know-how therefor; and WHEREAS, VOGT is willing to grant *385 the right to use this know-how to KHI on the conditions set forth hereinafter;
NOW IT IS AGREED AS FOLLOWS: CLAUSE 1 Definitions:
a. Products shall mean Henry Vogt type, natural circulation, water tube, horizontal gas flow type Waste Heat Steam Generator for Gas Turbine Exhaust Recovery, except those for use in the thermal enhanced oil recovery applications and those for marine use. * * * b. Technical Information shall mean certain information relating to Products in VOGT's possession, to the extent of VOGT's right by law thereto. * * * c. Technology Transfer Fee shall mean payment received by VOGT for the transfer of Technical Information * * * d. Territory shall mean the whole world except the United States of America and its protectorates, Canada and Mexico * * *
* * * * CLAUSE 3 Manufacturing and Selling Rights
a. VOGT grants to KHI manufacturing and selling rights as provided hereunder: 1) Manufacturing Right An exclusive right and license to manufacture Products in Japan. 2) Selling Right 1. An exclusive right and license to offer and sell Products for installation in Japan. 2. A non-exclusive right and license to offer *386 and sell Products in: A. The Asian countries, the Oceanian countries, the Middle East countries, and the Union of Soviet Socialist Republic except U.S.A.'s Protectorates (American Samoa, Guam and Wake I.) B. Any other countries of [sic] Territory as defined in Clause 1(d) whenever principally Japanese financing is a requirement by the customer or the Product is incorporated into a plant which will be supplied by a Japanese company, except for installation in Western Europe. * * *
b. KHI shall not grant sub-licenses without the written consent of VOGT.
* * * f. During the terms of this Agreement, KHI will not engage in the manufacture of any products designed by KHI or by any other manufacturer that are in competition with the Products licensed under this Agreement without the advance written consent of VOGT, provided, however, that VOGT will give permission to KHI, in case the client designates or specifies type of boiler other than the Products.
CLAUSE 4 Technical Data and Drawings
a. VOGT shall furnish KHI with Technical Information * * * at VOGT offices in Louisville, Kentucky after receipt of Technology Transfer Fee.
* * * CLAUSE 5 Personnel *387 Support and Training
a. During the life of this Agreement at the reasonable request of KHI, VOGT will admit to that portion of its factory producing Product a reasonable number of KHI employees to inspect and keep acquainted with VOGT's engineering discipline * * * on the condition that the regular course of business of VOGT is not interfered with thereby, and provided that all expenses of such KHI employees will be borne and paid for by KHI.
* * * CLAUSE 6 Secrecy
All data, drawings and other Technical Information supplied under this Agreement are for the exclusive use of KHI and KHI agrees that same will not be given, sold or made available in any fashion to any other firm, company or person and KHI shall not permit any other firm, company or person to use the Technical Information, directly or indirectly, or permit such activities as aforesaid, except for use in sub-contracting of any components of Products. All Technical Information supplied by VOGT pursuant to this Agreement shall remain the property of VOGT, and KHI shall not use any Technical Information supplied under this Agreement for any purpose except the design, manufacture, quotation, sale, erection *388 and operation of Products within the territory during the term of this Agreement. During the term of this Agreement, KHI will hold in confidence and not disclose any Technical Information furnished by VOGT hereunder without a prior written consent of VOGT except as necessary for the proper performance of this Agreement and excepting the following information which: 1. at the time of disclosure to KHI is known to the public; 2. after the time of disclosure to KHI becomes known to the public through no fault of KHI; 3. at the time of disclosure to KHI was in the possession of KHI; or 4. after the time of disclosure to KHI is lawfully received by KHI from a third party.
CLAUSE 7 Compensation
In consideration of grant of right and license, supply of Technical Information * * * and supply of technical assistance * * *, KHI shall pay to VOGT: a. Technology Transfer Fee - A single payment of US $ 500,000 (U.S. Dollars Five Hundred Thousand) will be paid within forty-five (45) days after execution of this Agreement. b. Royalties - * * * KHI will pay to VOGT a royalty, which shall be computed at three percent (3%) of Net Selling Price of *389 each Product manufactured and sold by KHI under this Agreement. c. In no event shall VOGT ever receive * * * as total compensation under this Agreement, an amount less than the minimum yearly Royalty fee of $ 60,000, except that the minimum yearly Royalty shall be exempted for the first half of the first Contract Year. d. The compensation rates herein provided for shall continue for the duration of this Agreement, unless altered in accordance with the terms of Clause 21 hereof.
CLAUSE 8 Payments and Accounting
a. The Royalties mentioned in Clause 7b will be due to VOGT after receipt of the first payment after shipment to KHI's customer for the Products by KHI and will be paid to VOGT at the time the Semi-Annual Statement is submitted as per Clause 8c. b. One half of the minimum yearly Royalty mentioned in Clause 7c will be paid to VOGT at the time the Semi-Annual Statement is submitted. In spite of the foregoing, the minimum yearly Royalty may be set off against the Royalty payable by KHI during the first half Contract Year and the second half Contract Year. c. Semi-Annual Statement shall be submitted by KHI to VOGT for period ending with the end *390 of each half Contract Year during the continuance of this Agreement, listing Products upon which manufacturing by KHI is complete and an addendum listing Products upon which manufacturing is not complete. The Semi-Annual Statement shall identify: (i) Date of order, (ii) Name of Client, (iii) Destination, (iv) Steam capacity, (v) Pressure, (vi) Date of completion or scheduled completion of the Products, and (vii) The Royalty amount payable thereon. This report shall be sent to VOGT within 30 days following the specified period. d. All amount which KHI owes VOGT under this Agreement will be paid by KHI to VOGT in United States Dollars and remitted by telegraphic transfer, at the rate of exchange prevailing at the authorized foreign exchange bank in Japan on the day of remittance, free from bank or other charges, which charges, if any, are to be paid by KHI. Any tax imposed in Japan on compensation payments to VOGT as referenced in Clause 7 shall be borne by VOGT. In the event KHI is required to withhold such taxes from the amount payable to VOGT hereunder, and to pay said taxes on behalf of VOGT, KHI shall furnish VOGT with a certificate of such tax payment duly executed by *391 the proper Japanese authority and attached to the Semi-Annual Statement. VOGT will file a tax form called "Application Form for Income Tax Convention (Form 3)" stating that it is a U.S. resident company and does not have a permanent establishment in Japan, etc. The filing shall be made through KHI with a Japanese tax office prior to payment. e. KHI will advise VOGT of each sale of a Product by forwarding to VOGT a copy of each order immediately after said order has been placed with KHI. f. KHI shall, during the term of this Agreement, keep accurate and complete records of all Products, including the identifying data required in the Semi-Annual Statement. These records shall be made available for inspection and copying by authorized representatives of VOGT during any normal business day; provided however, that an inspection of KHI's records shall be made by VOGT only upon and after giving to KHI of at least ten (10) days written notice by VOGT of VOGT's intention to inspect such records.
* * * CLAUSE 12 Patents
c. If KHI desires that a patent be obtained for a patentable invention made by VOGT in the Territory, VOGT will cooperate with KHI in obtaining such *392 patent for VOGT if VOGT desires the patent. All fees incurred in investigating or obtaining such patents shall be payable by KHI; provided however, that any such patent obtained by KHI for VOGT will be subject to this Agreement and may be used by KHI without additional compensation to VOGT * * *.
* * * e. In case a patent of VOGT shall have lost its importance to VOGT in the Territory, VOGT will consult with its Licensees not later than 6 months before the date upon which any patent fees fall due. If all the Licensees agree, VOGT will cease to maintain such patent whereby KHI may maintain such patents for its own account in VOGT's name.
CLAUSE 13 Technical Improvements
a. In order to further the mutual interest of the two parties, VOGT shall make known and available to KHI and KHI shall make known and available to VOGT, free of any charge, all improvements and developments relating to Licensed Product, including the manufacture thereof, during the time when this Agreement remains in force whether or not such improvements and developments are patented, provided, that these improvements, new designs and inventions developed by VOGT's licensees shall not be *393 made available to any other existing VOGT licensee. b. Those improvements and developments shall be considered as the property of the party which has made the improvements and developments.
CLAUSE 14 Nameplate
For the duration of this Agreement, KHI will affix to every Product manufactured by it a plate showing the designation "VOGT MSG" or "VOGT" * * *.
* * * CLAUSE 16 Duration of Agreement
a. This Agreement will be in effect for the term of TEN (10) YEARS from the effective date hereof, unless terminated earlier under the terms provided for. b. After the expiration of the initial TEN (10) YEAR TERM, this Agreement will be continued from year to year, in accordance with the terms and conditions to be agreed upon by both parties unless notice is given in writing by one party to the other at least sixty (60) days before the expiration of the original or extended period that the notifying party does not intend to review or extend this Agreement. c. In the event that either of the parties hereto, at anytime during the term of this Agreement, commits the breach of any provision hereunder, and fails to rectify such breach within ninety (90) days *394 from the receipt of written notice thereof from the other party hereto, such other party may, at its sole option, and in addition to any other remedies that it may be entitled to, terminate this Agreement forthwith by notice in writing to the breaching party to such effect within thirty (30) days from the end of the above ninety (90) days [sic] period. This agreement may be terminated forthwith at any time by either party upon the bankruptcy, dissolution of either KHI or VOGT; provided further that this Agreement may be terminated forthwith by either party if there should occur a substantial change in the management, operation or control of KHI or VOGT.
CLAUSE 17 Obligations of KHI After Termination of Agreement
a. After any termination of this Agreement as herein above provided, KHI will no longer have the right to manufacture Products, and to use Technical Information supplied to KHI by VOGT under this Agreement. b. Any notice of termination, or any termination, of this Agreement will not prevent KHI from completing manufacture and delivering Products which were ordered before the date of said notice; provided, however, that KHI will have the duty to make the *395 Royalty payment required * * *, provided further, that KHI will have the duty to maintain Secrecy of all Technical Information * * *, and KHI will have the duty to return to VOGT all designs, drawings and other physical materials comprising the Technical Information within thirty (30) days after termination.
CLAUSE 18 Assignment
The rights and obligations arising out of this Agreement shall not be assignable by either party without the written consent of the other party.
* * * CLAUSE 20 Law Applicable
This Agreement shall be deemed to have been made in the Commonwealth of Kentucky, United States of America, and the parties intend to be governed * * * by the laws of Commonwealth of Kentucky, United States of America.
CLAUSE 21 Modification
This Agreement shall not be modified except by a supplemental agreement executed by an authorized representative of both of the parties hereto.
* * * CLAUSE 24 Integration, Merger and Waiver
a. The terms and provisions contained on this and the foregoing pages of this Agreement, are the full agreement of the parties * * *, no prior understanding or obligation not expressly set forth herein shall *396 be binding upon the parties to this Agreement, and no subsequent modification of this Agreement shall be binding upon the parties unless negotiated upon the terms herein provided and executed with the same formalities as this Agreement. b. It is expressly understood that all prior negotiations pertaining to the subject matter of this Agreement are merged into this Agreement, and this Agreement contains the full agreement between the parties.
* * * d. If any provision of this Agreement is deemed to be illegal or invalid, the remaining provisions of this Agreement shall not be affected thereby.
Petitioner reported all payments received under the Yamada agreement as ordinary income. One such payment was the $ 500,000 "Technology Transfer Fee" paid by KHI to petitioner during fiscal year 1985. At an unspecified date in 1985, petitioner's officers were informed that the payments from KHI could be taxable as long-term capital gain, rather than ordinary income, if petitioner conveyed to KHI the exclusive and perpetual right to use its HRSG technology to manufacture, use, and sell HRSG's and products derived therefrom in Japan. In this respect, an internal memorandum *397 dated September 13, 1985, captioned Taxation of License Agreements, sent to the officers of petitioner, stated: Subsequent to a discussion about the DISC with an attorney at the Chicago Law Firm of Baker & McKenzie we were sent the attached report on taxation of foreign license agreements and technology transfer fees as capital gains. Long terms [sic] capital gains are taxable at a rate of 20% versus ordinary income at 50%. This differential in taxation could save the company over $ 150,000 in taxes in fiscal 1985 alone. While there are no guarantees that we will be able to recover excess taxes due on income from current license agreements, there is a distinct possibility that future taxes may be reduced by a significant amount. John Ryan reviewed the attached article and sees no conflicts other than perhaps the word "perpetual". I feel that we should consider engaging Baker & McKenzie to explore this possible opportunity. It may also behove us to run our current license agreements past them for review as we already are aware of some errors and ommissions [sic] in them.
A subsequent memorandum, dated October 30, 1985, stated: Attached please find a listing of only *398 the changes which must take place in order to allow the KHI-VOGT agreement to qualify for capital gains. Anything not mentioned on these pages will remain exactly as it was written in the original document. Sorry about the Chicago lawyers changing minor wording throughout the agreement. Most of their changes improve the document but have little bearing on capital gains treatment. The new Clause 25 is necessary unless you want the risk of a jail term or fine for not complying with U.S. export licensing laws. Please present these documents, along with the enclosed Baker & McKenzie letter of explaination [sic] and the HVHjr letter I sent to Tokyo earlier. Do not present KHI with the fully revised agreement, we will send them a fresh copy after they agree to the revisions. All we need are the changes on these pages. Please try to get a feel for their willingness to proceed with the revision on timely basis. Our position remains that we would like to grant KHI additional rights in order to receive better treatment under U.S. tax laws.
In yet another memorandum, while future tax savings were reiterated to be the primary reason for revising the Yamada agreement, revision of *399 the Yamada agreement "to protect [petitioner] from potential trade restriction violations" was also mentioned. However, Kunio Kitahara, KHI's chief negotiator regarding all relevant transactions with petitioner, was under the belief that Federal tax savings were petitioner's only motive for revising the Yamada agreement. In this respect, Mr. Kitahara, testified: Q: What reasons did -- oh -- who spoke with you concerning the desire of [petitioner] to cancel the Yamada agreement? A: Mr. Dennie S. Hunt did. [2]
Q: Thank you. Did Mr. Hunt give you any reason for wanting to cancel the agreement? A: Yes. Q: What were those reasons? A: He said it was due to the tax consideration. Q: Did he give you any other reasons for wanting to renegotiate the [Yamada] agreement? A: No.
Ultimately, an agreement (the Kubota agreement) was executed in late January or early February 1986. The Kubota agreement *400 purportedly canceled and superseded all prior agreements between KHI and petitioner regarding the HRSG technology, including the Yamada agreement. In several respects the Yamada agreement and the Kubota agreement are indistinguishable; in fact 19 of the Kubota agreement's 26 clauses are identical to those in the Yamada agreement. Each agreement controls the transfer of the same HRSG technology and each has identical compensation and termination clauses. Pertinent terms of the Kubota agreement that differ from those in the Yamada agreement are as follows: CLAUSE 1 Definitions:
d. "Exclusive Territory" shall mean Japan. "Non-Exclusive Territory" shall mean the countries listed in Clause 3.a.2) 2. hereof.
* * * CLAUSE 3 Manufacturing and Selling Rights
a. VOGT hereby grants to KHI Manufacturing and selling rights as provided hereunder: 1) Manufacturing right An exclusive and perpetual right and license to utilize the Technical Information for KHI's manufacture and use of the Products in Japan. 2) Selling right 1. An exclusive and perpetual right and license to offer and sell the Products for installation in the Exclusive Territory, i.e., Japan. *401 2. A non-exclusive right and license during the term of this Agreement to offer and sell the Products for installation in the Non-Exclusive Territory, consisting of the following countries, except the United States of America and its protectorates (including but not limited to American Samoa, Guam, Wake I.), Canada, and Mexico: A. The Asian countries (except Japan), the Oceanian countries, the Middle East countries, and the Union of Soviet Socialist Republics; and B. Any other countries in the remainder of the whole world (other than those expressly excepted hereinabove) whenever principally Japanese financing is a requirement by the customer or the Product is incorporated into a plant which will be supplied by a Japanese company, except for installation in Western Europe, * * *.
b. KHI shall be entitled to utilize the Technical Information only for the manufacture of the Products and not for any other purpose, in accordance with the terms and conditions of this Agreement. KHI shall not transfer, grant sublicenses, or otherwise disclose the Technical Information to any third person for use outside Japan. c. KHI shall have the right to sublicense the Technical *402 Information to third persons for use only within Japan, after KHI's receipt of the prior written consent of VOGT thereto, provided that such consent shall not be unreasonably withheld by VOGT. In the event that KHI elects to grant such a sublicense(s), KHI shall ensure that its sublicensee(s) shall sign written agreement(s) with essentially the same terms and conditions contained in this Agreement, including but not limited to a secrecy agreement and such terms as will protect VOGT's rights and property under this Agreement, as well as such terms that will contain, to the greatest extent possible, wording for the benefit of and to be enforceable by VOGT, as well as KHI. KHI shall be liable for the payment to VOGT of the Royalties * * * on the Net Selling Price of each of the Products manufactured and sold by each of KHI's sublicensees under every sublicense agreement between KHI and each of such sublicensees.
* * * CLAUSE 6 Secrecy
a. All of the Technical Information supplied by VOGT under this Agreement shall be for the exclusive use of KHI and KHI agrees that same shall not be given, sold, or otherwise made available in any fashion to any other firm, company, or *403 person except with the prior written consent of VOGT in accordance with the provisions of Clause 3 hereof, and KHI shall not permit any other firm, company or person to use the Technical Information, directly or indirectly, or to permit such activities as aforesaid, except as expressly permitted in accordance with the provisions of Clause 3 hereof. KHI shall not use any of the Technical Information supplied by VOGT under this Agreement for any purpose except the design, manufacture, quotation, sale, erection, and operation of the Products within the Exclusive Territory and the sale of the Products within the Non-Exclusive Territory during the term of this Agreement. b. During the term of this Agreement, KHI will hold in confidence and not disclose any Technical Information furnished by VOGT hereunder without a prior written consent of VOGT except as necessary for the proper performance of this Agreement and excepting the following information which: 1. at the time of disclosure to KHI is known to the public; 2. after the time of disclosure to KHI becomes known to the public through no fault of KHI; 3. at the time of disclosure to KHI was in the possession of KHI; *404 or 4. after the time of disclosure to KHI is lawfully received by KHI from a third party.
c. KHI shall impose such secrecy restrictions on all of its sublicensees and/or subcontractors in accordance with the provisions of Clauses 3.c. and d. hereof.
* * * CLAUSE 13 Technical Improvements
a. In order to further the mutual interest of both parties, VOGT shall make known and available to KHI and KHI shall make known and available to VOGT, free of any charge, all improvements and developments relating to the Products, * * *; provided, however, that any improvements or developments relating to the Products, including new designs and inventions, which are developed by any of VOGT's other licensees shall not be made available to KHI and, similarly, any such improvements and developments made by KHI shall not be made available to any other existing VOGT licensee.
* * * CLAUSE 17 Obligations After Termination of Agreement
a. After any termination of this Agreement by VOGT in accordance with the provisions of Clause 16.c. hereof, KHI shall no longer have the right to manufacture the Products and to use the Technical Information supplied to KHI by VOGT *405 under this Agreement. KHI shall have the duty to return to VOGT all of the design, drawings, and other physical materials comprising the Technical Information within thirty (30) days after such termination. b. Not withstanding [sic] the provisions as set forth in the above Clause 17.a., after the expiration or termination of this Agreement due to breach by VOGT * * *, KHI shall have the right to retain any Technical Information supplied by VOGT hereunder and shall have the right to manufacture and sell the Products in Japan without payment by KHI to VOGT. c. Any notice of termination, or any termination, of this Agreement will not prevent KHI from completing manufacture and delivering Products which were ordered before the date of said notice; provided, however, that KHI will have the duty to make the Royalty payment required * * *, provided further, that KHI will have the duty to maintain Secrecy of all Technical Information * * *.
* * * CLAUSE 25 U.S. Export Regulations
1. KHI acknowledges that the technical data disclosed by VOGT to KHI hereunder is subject to export control under the United States Export Administration Regulations. Accordingly, KHI will *406 not transfer, reexport or otherwise disclose, directly or indirectly, any of such technical data to any person in any of the following countries to which trade is restricted under the Export Administration Regulations without the prior approval of the United States Government: Afghanistan, Albania, Bulgaria, Czechoslovakia, East Germany, Hungary, Laos, Mongolia, Poland, Romania and the USSR. 2. KHI further acknowledges that under the Export Administration Regulations, a United States export license is required for the export and reexport of United States origin technical data and the direct product thereof to any of the following countries: Cuba, Kampuchea, Libya, North Korea and Vietnam. Accordingly, KHI will not, directly or indirectly, transfer, reexport or otherwise disclose any of the technical data disclosed to KHI by VOGT hereunder to any person in any of the foregoing countries, and will not reexport or otherwise transfer any of the products manufactured hereunder to any of the foregoing countries, without a validated United States export license or reexport authorization. 3. VOGT will advise KHI of any changes in the lists of restricted and prohibited countries under *407 the Export Administration Regulations, as set forth in Paragraphs 1 and 2 respectively.
Under each agreement (Clause 7 in both the Yamada and Kubota agreements), KHI was required to pay petitioner a "Technology Transfer Fee" as follows: A single payment of US $ 500,000 (U.S. Dollars Five Hundred Thousand) will be paid within forty-five (45) days after the execution of this Agreement.
KHI paid the "Technology Transfer Fee" under the Yamada agreement during fiscal year 1985; there is no evidence that KHI paid such fee at any time thereafter. No explanation was offered as to why KHI failed to remit the required $ 500,000 fee under the Kubota agreement, nor did petitioner explain why it did not seek enforcement of KHI's obligation to remit the $ 500,000 fee. KHI manufactured and sold three HRSG's during the years in issue for final installation in the country of India; each was manufactured in Japan, sold to a Japanese company, and shipped to an end user in India. KHI did not play a role in shipping the three HRSG's (which were shipped FAS Yokohama, Japan); it did, however, send supervisors to oversee the installation. During fiscal year 1986, KHI paid petitioner $ *408 80,000 (2 semi-annual minimum royalty payments of $ 30,000 each, and a $ 20,000 computer program maintenance fee); petitioner reported the $ 80,000 as long-term capital gain. [3]
During fiscal year 1987, KHI paid petitioner $ 267,623 [4] (a single semi-annual minimum royalty payment of $ 30,000, 2 semi-annual computer program maintenance fees of $ 5,000 each and royalty payments of $ 37,546.20 and $ 190,076.50); petitioner reported the $ 267,623 as long-term capital gain. [5]
Respondent determined that both the $ 80,000 and $ 267,623 payments reported as long-term capital *409 gain for fiscal years 1986 and 1987, respectively, were taxable as ordinary income. OPINION Petitioner contends that it is entitled to treat the payments received from KHI during fiscal years 1986 and 1987 as long-term capital gain under section 1222(3)[6] *410 because: (1) The HRSG technology is a capital asset under section 1221; [7] (2) petitioner's transfer of the HRSG technology to KHI under the Kubota agreement was a sale or exchange under section 1222(3); and (3) petitioner held the HRSG technology for the requisite holding period under section 1222(3). In support of its contention that there was a sale or exchange of the HRSG technology, petitioner asserts that under the Kubota agreement, which canceled and superseded the Yamada agreement, it transferred all substantial rights of value in its HRSG technology to KHI for KHI's exclusive and perpetual use thereof in Japan (the exclusive territory). Not surprisingly, respondent disagrees. Respondent maintains that the payments received by petitioner from KHI during the years in issue are royalty payments earned under a license *411 agreement, and therefore such payments are taxable as ordinary income under section 61(a)(6). [8] In support of its position, respondent makes the following three alternative arguments as to why all payments received by petitioner from KHI are taxable as ordinary income: (1) because the Kubota agreement should not be recognized for tax purposes; (2) if the Kubota agreement is recognized for tax purposes, then because the Kubota agreement is not supported by adequate consideration; and (3) if the Kubota agreement is recognized for tax purposes and supported by adequate consideration, then because petitioner retained certain substantial rights of value after the purported sale. We agree with respondent's third alternative argument; i.e., petitioner retained substantial rights of value after the purported sale of the HRSG technology to KHI. As a result, we need not, and do not, decide whether the Kubota agreement should be recognized for tax purposes or whether it is supported by adequate consideration. *412 To be entitled to long-term capital gains treatment, petitioner must establish: (1) That the technology in question constituted a capital asset; (2) that there has been a sale or exchange of such technology; and (3) that petitioner held such technology for more than 6 months prior to the "sale or exchange". Sec. 1222(3); Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115-116 (1933). Petitioner has established the first and third stated requirements. First, it is well settled that confidential, unpatented technology or technical know-how is property. Here, petitioner was not engaged in the trade or business of selling technology during the years in question; thus, it is clear that the HRSG technology constitutes a capital asset. Nelson v. Commissioner, 203 F.2d 1, 6 (6th Cir. 1953); Ofria v. Commissioner, 77 T.C. 524, 541-542 (1981); United States Mineral Products Co. v. Commissioner, 52 T.C. 177, 196-197 (1969); Heil Co. v. Commissioner, 38 T.C. 989, 1003 (1962); Speicher v. Commissioner, 28 T.C. 938, 944-945 (1957); *413 Wall Products, Inc. v. Commissioner, 11 T.C. 51, 56-58 (1948). Additionally, the record indicates that the HRSG technology was held by petitioner in excess of the 6-month period required under section 1222(3). Thus, the only question remaining is whether there was a "sale or exchange" of the HRSG technology, as contended by petitioner, or a mere license thereof, as urged by respondent. The taxation of transfers of unpatented technical data, secret processes, and trade secrets is a subject not specifically covered by statute or regulation. It is well settled, however, that unpatented technology, such as know-how, can be the subject of a sale and that the transfer of technical data and know-how is sufficiently akin to patents to warrant the application, by analogy, of the tax law that has been developed relating to the transfer of patent rights. Pickren v. United States, 378 F.2d 595, 599 (5th Cir. 1967); Liquid Paper Corp. v. United States, 2 Cl. Ct. 284, 289 (1983); Hooker Chemicals & Plastics Corp. v. United States, 219 Ct. Cl. 161, 175-176, 591 F.2d 652, 659 (1979); *414 Taylor-Winfield Corp. v. Commissioner, 57 T.C. 205, 213 (1971), affd. 467 F.2d 483 (6th Cir. 1972); Commercial Solvents Corporation v. Commissioner, 42 T.C. 455, 468-469 (1964). In order for the transfer of the HRSG technology to be deemed a sale for tax purposes, petitioner must establish that it surrendered all substantial rights of value in the HRSG technology in Japan; otherwise, the transfer is deemed to be a license. Glen O'Brien Movable Partition Company v. Commissioner, 70 T.C. 492, 500 (1978). Where an agreement transferring technical data or know-how is terminable at will by the transferor before the end of the remaining life of the technical data or know-how, the transferor is deemed to have retained substantial rights of value if subsequently it has the right to disclose the technical data or know-how to others in the transferee's exclusive territory. Glen O'Brien Movable Partition Company v. Commissioner, 70 T.C. 492, 504 (1978); see also Taylor-Winfield Corp. v. Commissioner, supra; *415 Kaczmarek v. Commissioner, T.C. Memo. 1982-66. However, the fact that the agreement transferring technical data or know-how does not require the know-how to be returned to the transferor upon termination of the agreement is not determinative as to whether the transferor actually retained the right to disclose such information (since obviously, the transferee cannot eradicate knowledge gained via the transfer upon termination of the agreement). Taylor-Winfield Corp. v. Commissioner, supra;PPG Industries, Inc. v. Commissioner, 55 T.C. 928, 1014 (1970), overruled on other grounds Latham Park Manor, Inc. v. Commissioner, 69 T.C. 199 (1977). Thus, the character of the payments received by petitioner from KHI under the Kubota agreement depends upon: (1) Whether the Kubota agreement was terminable by petitioner at will before the end of the remaining life of the HRSG technology, and (2) if so, whether petitioner has the right to disclose the HRSG technology to others in the exclusive territory upon termination of the agreement. An ancillary determination as to whether *416 the HRSG technology has a practical or material value to petitioner at the time when petitioner is able to terminate the Kubota agreement at will must also be made. In determining whether an agreement was a license or a sale for tax purposes, the Court of Appeals for the Fifth Circuit in Pickren v. United States, supra, at 599 stated: The cardinal rule in the interpretation of contracts is to ascertain the mutual intention of the parties and then, so far as it is possible so to do consistently with legal principles, give effect to that intention. * * *
We, therefore, shall start our deliberation by examining the terms of the Kubota agreement in order to ascertain whether petitioner and KHI intended that there be a transfer to KHI of all substantial rights of value in the HRSG technology. We are mindful that the terminology used in the agreement may be of significance. However, the label or name the agreement bears is not determinative, nor is the form thereof conclusive. Tomerlin Trust v. Commissioner, 87 T.C. 876, 881-882 (1986); Taylor-Winfield Corp. v. Commissioner, supra;Cleveland Graphite Bronze Co. v. Commissioner, 10 T.C. 974, 988 (1948), *417 affd. 177 F.2d 200 (6th Cir. 1949). Upon examining the terms of the Kubota agreement, we conclude the parties did not intend that petitioner transfer to KHI all substantial rights of value in the HRSG technology within the exclusive territory. We base our conclusion on the fact that petitioner had the right to terminate the Kubota agreement at will at the end of the 10-year term and thereafter petitioner retained the right to disclose the HRSG technology to others in the exclusive territory. In the instant case, the agreement contains an integration clause stating that it represents the full agreement between the parties and contains no language preventing petitioner from disclosing the technical data or know-how to other persons or entities in the exclusive territory after the termination of the agreement. To support its claim that the Kubota agreement effected a complete transfer of the HRSG technology to KHI in the exclusive territory, petitioner directs our attention to Clause 3.a.2. of the agreement which uses the word "perpetual" to describe KHI's exclusive right and license. Petitioner contends that clause 3.a. specifically limits the non-exclusive *418 license to the "term of this Agreement", whereas no such explicit limitation is stated with regard to the exclusive right and license. Further, petitioner points out that whereas the phrase "All Technical Information * * * shall remain the property of VOGT"; was included in clause 6 of the Yamada agreement, such phrase is not contained in the Kubota agreement. We do not deem the factors which petitioner calls to our attention persuasive. To begin with, when viewed in the context of the entire Kubota agreement, we do not believe the use of the term "perpetual" in clause 3.a. transforms the Kubota agreement into a sale or exchange. In cases where the terms "perpetual" or "irrevocable" appear in a know-how transfer agreement, but are incompatible with other provisions of the agreement, we have rejected arguments made by other taxpayers that the presence of those terms is determinative. Taylor-Winfield Corp. v. Commissioner, 57 T.C. at 217-218; PPG Industries, Inc. v. Commissioner, 55 T.C. 928, 1013-1014 (1970), overruled on other grounds Latham Park Manor, Inc. v. Commissioner, 69 T.C. 199 (1977); *419 Kaczmarek v. Commissioner, T.C. Memo. 1982-66. Clause 16 of the Kubota agreement, which is identical to clause 16 of the Yamada agreement, provides in part as follows: a. This Agreement will be in effect for the term of TEN (10) YEARS from the effective date hereof, unless terminated earlier under the terms provided for. b. After the expiration of the initial TEN (10) YEAR TERM, this Agreement will be continued from year to year, in accordance with the terms and conditions to be agreed upon by both parties unless notice is given in writing by one party to the other at least sixty (60) days before the expiration of the original or extended period that the notifying party does not intend to review or extend this Agreement.
In Glen O'Brien Movable Partition Co. v. Commissioner, 70 T.C. 492 (1978), the taxpayer transferred patent rights and the right to use unpatented technology and know-how to a Japanese corporation. Article 8 of the agreement in the Glen O'Brien case is similar to clauses 16.a. and b. of the Kubota agreement; it provides as follows: This Agreement shall become effective from the date *420 when Yawata obtains the Japanese government sanction and shall continue for a period of six (6) years thereafter; provided, however, that at the termination of this Agreement, it shall be extended for an additional period therefrom in case the parties are mutually agreeable provided that either O'Brien or Yawata gives the other party written notice that it wishes to extend this Agreement. * * *
Id. at 496-497. As to the transferred patent rights in Glen O'Brien, we held that because the taxpayer transferred all substantial rights of value, the transfer was a sale and the consideration received therefor was long-term capital gain. Id. at 501-502. However, as to the unpatented technology and know-how in Glen O'Brien, we held that because the taxpayer retained the right to disclose such know-how in the transferee's exclusive territory upon the taxpayer's termination of the agreement at will (which was a substantial right of value), the transfer was a license and the consideration received therefor was ordinary income. Id. at 504-505. Accore E. I. Dupont de Nemours & Co. v. United States, 153 Ct. Cl. 274, 289, 288 F.2d 904, 912-913 (1961). *421 In the instant case, clauses 16.a. and b. of the Kubota agreement give petitioner the absolute right to terminate the Kubota agreement at will after 10 years. Such termination right, together with the fact that the Kubota agreement does not expressly prohibit petitioner from disclosing the HRSG technology to others within Japan upon termination of the agreement, persuades us that petitioner retained the right to sell or license the HRSG technology to others in Japan after termination of the Kubota agreement. And, because petitioner has not established that the HRSG technology will lack practical or material value in the exclusive territory at the time when petitioner is able to terminate the Kubota agreement at will, we conclude that petitioner's right to sell or license the HRSG technology thereafter is a substantial right of value. [9]
*422 Our decision follows a line of cases which hold that where a transfer of a patent or technical data is terminable by the grantor not on the happening of a future event beyond his control but at his own discretion before the expiration of a patent or during the useful life of technical data, the grantor is deemed to have retained substantial rights of value in the technology or patent transferred. Commissioner v. Sunnen, 333 U.S. 591, 609 (1948); Young v. Commissioner, 269 F.2d 89, 92-94 (2d Cir. 1959), affg. 29 T.C. 850 (1958); Bell Intercontinental Corporation v. United States, 180 Ct. Cl. 1071, 1094, 381 F.2d 1004, 1020-1021 (1967); Taylor-Winfield Corp. v. Commissioner, 57 T.C. at 215-216; PPG Industries, Inc. v. Commissioner, 55 T.C. 928, 1014-1015 (1970), overruled on other grounds Latham Park Manor, Inc. v. Commissioner, 69 T.C. 199 (1977); Armour v. Commissioner, 22 T.C. 181, 188-189 (1954); Gregg v. Commissioner, 18 T.C. 291, 302 (1952), *423 affd. 203 F.2d 954 (3d Cir. 1953). But see Hooker Chemicals & Plastics Corp. v. United States, 219 Ct. Cl. 161, 177, 591 F.2d 652, 661 (1979) (holding that the strong and clear language of the agreement indicated that the taxpayer, in transferring patents and related know-how, retained no rights of value after the transfer); Bannister v. United States, 262 F.2d 175, 178-179 (5th Cir. 1958) (holding that in the context of the entire agreement, the termination rights reserved had no practical value). Petitioner argues that clauses 16.a. and b. of the Kubota agreement do not give it the right to terminate the entire agreement at will, but instead merely concern fragments of the Kubota agreement. Specifically, petitioner asserts that clauses 16.a. and b. only limit the period of time for which KHI is required to make royalty payments and the period for which petitioner is obligated to transfer new product developments to KHI. These arguments are the same as those made by taxpayer in Glen O'Brien to explain the termination clause in its agreement. 70 T.C. at 502-504. *424 We rejected such arguments in Glen O'Brien; we likewise reject petitioner's arguments in this case. Clauses 7 and 8 of the Kubota agreement address KHI's obligation to pay compensation and petitioner's rights regarding such payment. Clause 13 of the Kubota agreement controls the exchange of new product developments between petitioner and KHI. Neither clause 7, nor clause 8, contain language indicating the period of time for which KHI was obligated to make compensation payments under the Kubota agreement. While clause 13.a. does not dictate the specific time period within which petitioner and KHI must exchange technical improvements with each other, it requires such exchanges to occur "during the term of this Agreement". Because clauses 7, 8, and 13 do not explicitly indicate the length of time the rights and obligations are to continue, clause 16, titled "Duration of the Agreement", imposes durational limitations on such rights and obligations. As stated previously, clauses 16.a. and b. give petitioner the right to terminate the agreement at will after 10 years. Clauses 16.a. and b. do not explicitly refer to clauses 7, 8, or 13. In fact, clause 16.b. states that "this *425 Agreement will be continued from year to year * * * unless notice is given * * * that the notifying party does not intend to renew or extend this Agreement". [Emphasis supplied] The phrase "this Agreement" is clear and unambiguous: it means the entire Kubota agreement including the preamble, clauses 1 through 26, and all specifically referenced attachments thereto. [10]
*426 Accordingly, we hold that the all-inclusive language present in the termination provisions of clauses 16.a. and b. applies to the entire Kubota agreement, including clause 3. To reach any other conclusion regarding the express language of clauses 16.a. and b. would require us to disregard the clear language negotiated by two unrelated parties. In view of our conclusion, it is not necessary for us to consider the remaining arguments asserted by petitioner or respondent. To summarize, we hold that the transfer of rights in the unpatented HRSG technology for a limited period of time did not constitute a sale or exchange of such property under section 1222(3); consequently, the payments received by petitioner from KHI under the Kubota agreement are taxable as ordinary income. To reflect concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Dennie S. Hunt was the manager of petitioner's heat transfer division during the years in issue.↩
3. Petitioner concedes that the $ 20,000 received for computer program maintenance is taxable as ordinary income.↩
4. The exact dollar total of these items is $ 267,622.70.↩
5. Petitioner concedes that the $ 10,000 received for computer program maintenance is taxable as ordinary income.↩
6. SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES. For purposes of this subtitle -- * * * (3) Long-term capital gain. -- The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months if and to the extent such gain is taken into account in computing gross income.↩
[As amended by sec. 1001(a)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 1011, for assets acquired between June 22, 1984, and January 1, 1988.]
7. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include -- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer * * * (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation * * *, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property * * * (4) accounts or notes receivable acquired in ordinary course of trade or business * * * (5) a publication of the United States Government (including the Congressional Record) which is received from the United States Government or any agency thereof, other than by purchase at the price at which it is offered for sale to the public * * *↩
8. SEC. 61. GROSS INCOME DEFINED. (a) GENERAL DEFINITION. -- Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (6) Royalties;↩
9. Petitioner also failed to establish that at the time of the transfer↩ of the HRSG technology, such information would later lack practical or material value in the exclusive territory when the Kubota agreement is terminated.
10. Petitioner argues that Clauses 16.a. and b. were intended to have a narrow scope and only apply to fragments of the Kubota agreement. To this extent, petitioner is suggesting that the Kubota agreement is ambiguous. We disagree. However, assuming, arguendo, we did agree with petitioner that the Kubota agreement was ambiguous, (which we do not), we would still hold that Clauses 16.a. and b. apply to the entire Kubota agreement. Where the meaning of a transfer agreement is not plain and its terms are ambiguous, we must examine the agreement, its purposes, and the surrounding circumstances in order to determine if a sale was mutually intended. Glen O'Brien Movable Partition Company v. Commissioner, 70 T.C. 492, 500↩ (1978). While Messrs. Hunt and Kitahara each testified that the Kubota agreement effected a sale of the HRSG technology, the questions posed to them called for interpretation of the agreement and the answers given in response thereto were contrary to the clear language of the agreements. Except for their testimony, the trial transcript is practically devoid of any mention of the Kubota agreement's termination provisions. As the chief negotiators regarding the Yamada and Kubota agreements for petitioner and KHI, respectively, Messrs. Hunt and Kitahara must have been aware of whether Clauses 16.a. and b. were intended to apply to the entire Kubota agreement or just fragments thereof. Yet, neither Mr. Hunt, nor Mr. Kitahara, the only witnesses to testify at trial, testified as to the scope of Clauses 16.a. and b. As a result, there is no testimony or other evidence to support petitioner's assertion that Clauses 16.a. and b. were intended to have a narrower scope.